68 N.J. Super. 235 (1961)
172 A.2d 206
MERCHANTS INDEMNITY CORP., OF NEW YORK, ETC., PLAINTIFF-APPELLANT,
v.
EDWARD L. EGGLESTON, JEAN A. EGGLESTON, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 13, 1961.
Decided May 25, 1961.
*238 Before Judges CONFORD, FREUND and KILKENNY.
Mr. Raymond L. Cunneen argued the cause for plaintiff-appellant (Mr. Hugh J. O'Gorman on the brief).
Mr. Warren Brody argued the cause for defendants-respondents (Messrs. Winetsky and Brody, attorneys for *239 Edward L. Eggleston, Jean A. Eggleston and Jacob F. Tussel, Jr.; Mr. Jack J. Camillo, attorney for Christine Krebs, administratrix ad prosequendum and general administratrix of the estate of Herbert Arthur Krebs, deceased; Mr. Brody on the brief).
The opinion of the court was delivered by FREUND, J.A.D.
This declaratory judgment proceeding was commenced by the plaintiff insurer, Merchants Indemnity Corp. (hereinafter "Merchants"), seeking a determination that it was not obligated to undertake the defense of a separate action against defendants Jean Eggleston and Jacob F. Tussel, Jr. and that it was entitled to rescind an automobile liability policy issued to defendants Jean and Edward L. Eggleston on the ground of fraudulent misrepresentation as to ownership of the subject vehicle. Merchants brings this appeal from a Chancery Division judgment in favor of the defendants.
The policy in question  a standard "Family Automobile Policy"  was first issued to the defendant Edward L. Eggleston on October 30, 1957, covering a 1954 Chrysler which he then owned. The instrument contains the usual omnibus clause, defining as "persons insured," with respect to the described vehicle owned by the named insured, "the named insured and any resident of the same household," and "any other person using such automobile, provided the actual use thereof is with the permission of the named insured." On February 4, 1958 the policy was endorsed to extend its coverage to a 1955 Lincoln and to include specifically, as "a named insured," Edward's wife, defendant Jean Eggleston. At the instance of Edward Eggleston, the policy was again endorsed, on April 9, 1958, to eliminate coverage of the Lincoln and to cover instead a 1957 Ford Thunderbird. Except for a slight increase in the stated premium, the terms of the policy were not otherwise expressly altered by the substitution of the Ford for the Lincoln vehicle.
*240 On May 12, 1958 defendant Jacob F. Tussel, Jr., brother of Jean Eggleston, and then about 19 1/2 years of age, was involved in a collision while driving the Thunderbird in Scotch Plains, N.J. Herbert Arthur Krebs, a passenger in the Thunderbird, was killed in this accident. Krebs' administratrix instituted a wrongful death action against Tussel and Jean Eggleston on October 14, 1958. The defendants turned the litigation papers over to Merchants, which continued a previously commenced investigation of the accident, and also engaged counsel to undertake the defense of the insureds. On January 5, 1959, the complaint in the instant action was filed; process was not effectuated on defendants until February 25, 1959. Merchants has continued, nonetheless, to conduct the defense of Tussel and his sister in the primary death action, trial of which, we are informed, is still pending.
The issues herein are whether the insureds falsely represented ownership of the vehicle and, if so, whether such a misrepresentation was material and entitled Merchants to disclaim liability on the policy; and, if it is determined that Merchants had a right to void the policy, whether that right was waived by the insurer's conduct in undertaking to defend Tussel and Jean Eggleston subsequent to acquiring knowledge of the misstatement.
The testimony concerning the purchase of the Thunderbird and the consequent execution of the policy endorsement is somewhat in conflict, but may be summarized essentially as follows. Jacob F. Tussel, Jr., his parents, and the Egglestons all lived on a single tract of land in Clark Township, N.J., though not in one household. Jacob and his mother and father resided in the main house, while his sister and Edward lived in an adjoining trailer. Jacob worked for his father in the contracting business; Jean was employed as an office nurse.
At the time the Egglestons acquired the 1955 Lincoln, they instructed their insurer to prepare the aforementioned endorsement and also informed him that Tussel would be *241 an occasional user of the vehicle. On or about March 29, 1958, Jacob, his sister and brother-in-law visited a used car lot and placed a deposit on the 1957 Thunderbird. About a week later, the three returned to the lot and Jacob paid the balance of the $2,700 purchase price. The parties concede that Edward and Jean Eggleston did not furnish any of the consideration for the vehicle. The money was paid entirely by Jacob, and represented, to the extent of $700, his own funds, the remainder having been furnished him by his parents. While the receipts for the payments were issued in Jacob's name, the title certificate to the automobile was placed in the name of Jean Eggleston. The Egglestons paid the registration fee and, later, the insurance premiums.
Within a day or two after the purchase, Edward L. Eggleston telephoned his insurance agent, Henry S. Gilbert, for the purpose of substituting the Thunderbird for the Lincoln on the policy. According to Eggleston, he informed Gilbert "that Jacob was interested in a Thunderbird and that we would like to have this car covered by insurance, that Jacob would drive it, and that my wife would use this car instead of the 1955 Lincoln for work." Eggleston admitted under oath that he did not specifically tell Gilbert that Jacob was the "owner" of the car. Gilbert, who was the vice-president of the Braunsdorf Associates Insurance Agency, an authorized agent of Merchants, testified that he was told by Eggleston that the Thunderbird "was owned, as was the Lincoln, by Mrs. Eggleston"; and upon inquiring as to its use by Tussel, he was told it was "the same as for the Lincoln." Gilbert categorically denied having been told that Jacob was interested in purchasing the Thunderbird or that he had put up the money for the vehicle.
Following the collision of May 12, 1958, further endorsements were issued by plaintiff on the Egglestons' policy, one of which had the effect of expressly excluding Tussel from its coverage, as of May 13, 1958, and the other of removing the Thunderbird from coverage.
*242 Almost immediately after the occurrence of the accident, one of Merchants' investigators elicited a statement from Tussel, in which he described the accident and stated that he drove "a 1957 Ford Thunderbird owned by my sister and brother-in-law Jean Eggleston"; he added, "I was driving this car with my sister's permission." About two weeks later, a statement was taken from Jean Eggleston, in which she said: "I have a 1957 Ford Thunderbird registered in my name that is actually owned and was purchased by my brother, Jacob Tussel." The statement further recites that one of the reasons for registering the vehicle in Jean's name was that she was to drive it back and forth to work and that Jacob would operate it only when she was not using it. The other reason was "to get the insurance as cheap as possible." She concluded that "there was no question that he owned the car but we registered it in my name legally for the above stated reasons * * *."
On September 19, 1958, approximately a month before the institution of the death action, plaintiff's investigator obtained additional statements, one from Tussel, and one from the Egglestons. Tussel, while referring to his sister as the "owner" of the Thunderbird, freely admits in his statement that the car was purchased by him. He adds: "I purchased this car in my sister Jean's name because of my age and some other personal reasons." The Egglestons' statement likewise refers to the vehicle as "owned" by Jean, "purchased" by Jacob, and placed in Jean's name because of Jacob's age and for other personal reasons. The testimony of the defendants was uncontradicted to the effect that Jean Eggleston did in fact use the Thunderbird to drive to and from her daily employment.
The trial judge determined that the Egglestons had misrepresented to or concealed from Merchants' agent the true interest of Tussel in the Thunderbird, and that such misstatement or omission was material and, even though perhaps innocently made, would support rescission of the insurance contract. However, the judge concluded that Merchants' *243 unconditional direction of the defense of its insureds in the death action after having obtained knowledge of the misstatement, with no attempt to reserve its rights or to obtain a non-waiver agreement, amounted to a waiver of the defense of material misrepresentation and estopped it from setting up the policy violation as a bar to its obligation to the insureds.
Merchants contends on appeal that its activities in defense of the death action, prior to commencement of the instant suit, do not constitute a voluntary waiver of its defenses under the policy. It maintains that notice to an insured of an asserted policy violation is timely made if it is given a reasonable time before trial of the action against the insured; here, it says, such notice was communicated within several months of the institution of the primary action, in the form of the filing of the complaint and service of process in the instant declaratory proceeding.
Defendants assert that Merchants' exclusive control over the defense of the death action, knowing all the while of the nature of the alleged misrepresentation, comprised a voluntary decision to relinquish any policy defenses along these lines; further, that the defense activities  both before and after the commencement of the declaratory action  put the insurer in the conflicting role of both protecting and oppressing the insureds, the latter having been placed in the intolerable position of having to cooperate with the insurer under the terms of the policy and thus having the defense tailored to the insurer's wishes, while at the same time anticipating the possible loss of coverage under the policy. The prejudicial effect of the insurer's "squeeze play," according to defendants, is so obvious as to require that Merchants be equitably estopped from rescinding the policy.

I.
We deal initially with the issue of whether the Egglestons were in fact guilty of a material misrepresentation entitling *244 Merchants to avoid liability on the policy. Defendants here question the correctness of the trial judge's ruling in this respect. They assert that legal title to the Thunderbird resided in defendant Jean Eggleston and that they were not requested to detail in the instrument the fact that Tussel had provided the purchase moneys. Additionally, they reemphasize Edward L. Eggleston's testimony that he did in fact inform Merchants' agent that the car had been purchased by Tussel. Finally, they conclude that the question of what is meant by "ownership" in the context of an insurance contract is certainly a debatable one, and urge that the rule of contract construction favoring the insured should here operate to resolve this issue in favor of an equation of "owner" with the legal titleholder, in accordance with what was allegedly their understanding.
We first consider whether a statement as to ownership in an automobile liability policy is material to the obligation of the insurer. If the statement is expressly embodied in the policy as a "warranty," there is no dispute, for warranties are by definition essential terms of the contract, breach of which permits the insurer to avoid liability. 2 Richards, Insurance, § 305, pp. 1003-06 (5th ed. 1952). "Representations," on the other hand, whether contained in the policy itself or merely in the applicant's declarations preparatory to issuance of the policy, will only invoke forfeiture of the insured's rights if they are untruthful, material to the particular risk assumed by the insurer, and actually and reasonably relied upon by the insurer in executing the contract. Ibid. § 306, pp. 1009-11. See 5A Am. Jur., Automobile Insurance, § 13, p. 16.
It has generally been held that representations as to the identity of the named insured and the precise nature of his interest relate to a subject material to the carrier's risk, thus entitling the latter to disclaim liability if the representation turns out to be false. 2 Richards, Insurance, supra, § 357, pp. 1177-78; 4 Appleman, Insurance Law and Practice, § 2624, p. 490 (1941); see Annotation, 33 A.L.R.2d *245 948 (1954). The theory upon which ownership is deemed material goes to the heart of the insurance operation: acceptance of a mathematically categorized risk in return for a computed premium consonant with that risk. In the instance of automobile liability insurance, moreover, there are situations in which the particular risk  because of general age grouping, personal accident record, or otherwise  is considered too high to justify coverage at any cost; in such a case, the insurer simply will not enter into a contract with the applicant in question. One of the established risk categories most susceptible to denial of coverage is that of the minor male driver. This known fact was substantiated by plaintiff's witness, Gilbert, who testified that if the Thunderbird in the instant case had been registered in Tussel's name or if he had been its principal operator, not only would the premium certainly have been higher but the policy could not have been issued without prior submission to the home office of the company for its investigation and approval or rejection. Approval of a policy covering Tussel as owner or principal operator would have been extremely conjectural in the light of his testimony that he had been involved in three accidents previous to the incident with the Thunderbird. In any event, the materiality of the true identity of the owner or principal operator is readily apparent. See 5A Am. Jur., supra, § 16, p. 19.
Nor does the fact that Tussel, even as a minor male, was covered under the omnibus clause of the policy  with the knowledge of the insurer  detract from the relevancy of the alleged effort to disguise his status as owner or primary user. The use of a vehicle "with the permission of the named insured" represents an entirely distinct risk  from the insurer's view  from the ownership or primary operation of the automobile. The former is considered, on the average (and risks are calculated, after all, on average performance), a casual and occasional risk; the company makes the reasonable assumption that ordinarily the major use of the vehicle will be by the named insured or specified principal *246 operator. Should it be revealed that the under-age male driver occupies a position which increases the likelihood and frequency of his use (e.g., a member of the same household as the named insured), the premium would increase accordingly by virtue of the change in rating class of the named insured. There is, finally, this major factor bearing on the materiality of full disclosure of the true owner and principal operator:
"Where the application for the insurance is made by the true owner and he is to be designated in the policy as the named insured, the insurance company, before issuing the policy, may investigate the age and other facts with respect to such owner which it deems important in determining whether to issue the policy, but where the fact with respect to ownership is misrepresented and the identity of the true owner is concealed with the purpose of obtaining coverage for the true owner under the omnibus clause, no such opportunity is present." Didlake v. Standard Insurance Co., 195 F.2d 247, 250, 33 A.L.R.2d 941, 947 (10 Cir. 1952).
The trial judge, in accordance with these principles, found that the interest of Tussel in the Thunderbird was material, and, further, that it was "not fully disclosed to the agent for the plaintiff." He went on to say, however, that "fraud may not have been intended," and applied the rule of law that, nonetheless, "an innocent material misrepresentation will, in equity, support rescission of an insurance contract." Equitable Life Assurance Society of United States v. New Horizons, Inc., 28 N.J. 307, 314 (1958); Citizens Casualty Co. of New York v. Zambrano Trucking Co., Inc., 140 N.J. Eq. 378 (Ch. 1947), affirmed 141 N.J. Eq. 310 (E. & A. 1948). It is thus inferable that the judge's findings were predicated not upon the motives of the defendants as elicited from the conflicting testimony, but rather upon a perhaps unintended but factually inaccurate statement in the written policy declaration or endorsement thereto.
Did the insureds misrepresent ownership of the Thunderbird within the terms of the contractual instrument? We have examined both the original policy and the endorsement extending its coverage to the Thunderbird, and are not *247 necessarily convinced that its terminology reflects an affirmative misrepresentation, as distinguished from a concealment  either intended or innocent  on the part of the assureds.
The only relevant statement contained in the original declaration and policy is that the named insured is the "owner" of the principal vehicle covered. The concept of "ownership" is obviously fraught with analytical difficulties, see Cohen, "Dialogue on Private Property," 9 Rutgers L. Rev. 357 (1954), and it may well be that the Egglestons conceived that Jean "owned" the car. Indeed, their statements to Merchants' investigators bespeak their continuing confusion, their belief that while Jacob "purchased" the automobile, Jean was the "owner" of it. Nor can we say, objectively, that the holder of legal title is not the "owner" in one proper sense of the term. Both common usage and our Motor Vehicle Registration Law, N.J.S.A. 39:3-3 et seq., so recognize him. Moreover, our Supreme Court, in a number of cases in recent years, has held that the above statutes constitute the official reflector of ownership of a motor vehicle. See National City Bank of New York v. Del Sordo, 16 N.J. 530 (1954), involving the recording of chattel mortgages on motor vehicles; Eggerding v. Bicknell, 20 N.J. 106 (1955), holding that an automobile dealer which had yet to transfer title to one of its vehicles in accordance with the statutory procedure was still the "owner" thereof for purposes of insurance coverage under the terms of its policy; and Norris v. Allstate Ins. Co., 34 N.J. 437 (1961), also holding that the named assured had acquired "ownership" of a vehicle within the meaning of a liability clause when he acquired statutory title thereto, even if it were shown that the car was in fact used exclusively by his son and intended as a gift for the son. The important point concerning these cases, and distinguishing them from the instant matter, is that no assertion of fraud or misrepresentation with respect to ownership was involved. The decisions simply recognized the proposition, with which we are in full accord, that the holder of statutory title to a motor *248 vehicle is in a real sense the "owner" thereof. They do not indicate that an insurer is prevented from disclaimer on the basis of fraudulent misrepresentations as to ownership, regardless of the information it requests from its insured on an application or by policy warranties or representations.
While insurance carriers may, within the confines of public policy, write their contracts in any manner they desire, the language of their instruments will be construed strictly and will, in cases of ambiguity, be held to favor the insured. Korfin v. Continental Casualty Co., 5 N.J. 154, 158 (1950); Reese Cadillac Corp. v. Glen Falls Ins. Co., 59 N.J. Super. 118, 126 (App. Div. 1960). We cannot here say that the listing of the legal titleholder, in response to a mere request for a statement of "ownership" by the insurer, will, in the absence of fraudulent intent, give rise to disclaimer of liability on the ground of material misrepresentation.
It is further urged, however, that the later endorsement of the policy contained an explicit statement with respect to the nature of the ownership of the Thunderbird, and that the insureds' acceptance and approval of this statement as made undeniably constituted a misrepresentation. The endorsement consists of a one-page instrument, filled with delineated blanks, asking for information as to the named insureds, the make, type and cost of the added vehicle, the date on which it was purchased, and the changes in premium. One small section of the instrument, emphasized by plaintiff at trial, is here reproduced as accepted by the insureds:

 | | |
 | | |
 =========================================================================|
| The Automobile is fully paid for and the Insured is the sole and |
| unconditional owner thereof, except as follows: |
|-------------------------------------------------------------------------|
| | Installment Payments | |
| |--------------------------| Due Date of Final |
| Encumbrances | Number | Amount Each | Installment is |
|--------------|----------|---------------|-------------------------------|
| | | | |
| | | | |
| $ | | $ | |
 =========================================================================

*249 It was contended below, and the trial judge apparently agreed, that the failure of the insureds to respond to this declaration constituted a representation, false in fact, that the Egglestons were the sole and unconditional owners of the vehicle, to the exclusion of any equitable interest in any other party. There is some doubt that the form of this declaration, directed as it is towards ordinary commercial encumbrances, e.g., chattel mortgage liens, conditional sales contracts, etc., is sufficiently definite or explicit to adequately inform the insured that the name of a relative who has furnished the consideration, in what amounts to a family purchase, must be listed. Indeed, such a disclosure by the insured could not feasibly be placed in any of the blanks provided in the instrument.
While comparable considerations of public policy may not here be involved, the clear import of our Supreme Court's discourse on standardized industry contracts in Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358 (1960), is that the private individual must be fairly and adequately informed by the instrument, in terms capable of common understanding, of the precise nature of his obligations and rights. Cf. Mahon v. American Casualty Co. of Reading, 65 N.J. Super. 148, 165 (App. Div. 1961), certification denied 34 N.J. 472 (1961). The small print query reproduced hereinabove does not, in our view, reasonably notify the applicant, in such a context as that here involved, that failure to insert the name of a relative under the heading "encumbrances" and "installment payments" may serve to relieve the insurer of liability on the policy. While the insured is duty-bound to deal freely and fairly with the carrier in the disclosure of material facts, Atlantic Casualty Insurance Co. v. Interstate Insurance Co., 28 N.J. Super. 81, 85 (App. Div. 1953), this does not entail (absent fraudulent intent on the part of the insured) anticipating every possible facet of an ambiguous informational request.
Our observations with respect to the particular form of instrument here involved should not be considered dispositive *250 of the broader question of whether "sole and unconditional" ownership is misrepresented where the named insured holds legal title to the vehicle but equitable ownership rests in another, the latter having furnished the purchase moneys other than as a gift. We express no opinion on this question, although we do take note of prior holdings in this State to the effect that where the insured states that he is the "sole and unconditional" owner of the vehicle, he is held to have represented that no one else has any interest in the property as owner and that the title is not limited or affected by any condition. Hudson Casualty Insurance Co. v. Garfinkel, 111 N.J. Eq. 70, 73 (E. & A. 1932); Ambrose v. Indemnity Insurance Co. of North America, 124 N.J.L. 438, 441 (E. & A. 1940); United States Casualty Co. v. Timmerman, 118 N.J. Eq. 563, 565 (Ch. 1935). Cf. Savarese v. Hartford Fire Insurance Co., 99 N.J.L. 435, 437 (E. & A. 1924). However, in all of these cases, the impediment to sole and unconditional ownership was the usual commercial encumbrance, and not the equitable interest of a family member. See Pabon v. Hackensack Auto Sales, Inc., 63 N.J. Super. 476, 487 (App. Div. 1960). See, as bearing upon this question, Kietlinski v. Interstate Transportation Lines, Inc., 3 Wis.2d 451, 88 N.W.2d 739, 743 (Sup. Ct. 1958), where it was held that the party with legal title  as against one with a mere equitable interest arising from the provision of purchase moneys  was the "sole owner" within the meaning of the policy clause, the court emphasizing that "in common usage, `owner' is often equated to title-ownership." Also see Martin v. State Insurance Co., 44 N.J.L. 485 (Sup. Ct. 1882).
The remaining question is whether the insureds otherwise knowingly deceived Merchants by intentionally concealing the information with respect to Tussel's part in the purchase of the automobile. "Concealment" is the intentional withholding of a fact material to the risk which the assured in honesty and good faith ought to communicate to the underwriter. Kozlowski v. Pavonia Fire Insurance Co., *251 116 N.J.L. 194, 197 (E. & A. 1936). If the concealment relates to a matter specifically inquired of, the state of mind of the insured may be immaterial; in such an instance, the concealment by the insured would in effect constitute a misrepresentation. But where, as we have here held, there has been no specific inquiry, the concealment must be tainted with fraud in order to justify avoidance of the policy. Brighton v. North River Insurance Co., 106 N.J.L. 10 (Sup. Ct. 1929).
Four elements must be present before disclaimer of the insurance contract may be effectuated on the ground of concealment: (1) the insured must have knowledge of the fact; (2) he must know that the fact is or might be material to the risk; (3) it must in fact be material; and (4) the insurer must rely upon the statements  disclosed and undisclosed  concerning the subject matter to which this fact relates. 2 Richards, Insurance, supra, § 375, p. 1241. As stated above, the trial judge's opinion does not contain a finding that the insureds were aware of the materiality of Tussel's interest to the risk. While the evidence demonstrates knowledge on their part that insurance could most easily and inexpensively be obtained by placing title in the name of Jean Eggleston, it is not at all conclusive of the question of their awareness of the materiality of their course of action to the risk. They may very well have considered the insurer's only interest to be in the identity of the legal titleholder and may have concluded that once title was placed in Jean Eggleston's name, she being  in their eyes  the primary operator, they had accomplished an entirely proper transaction. Certainly their candor in stating the terms and form of the arrangement to Merchants' investigators tends to disprove a fraudulent design to hide Tussel's interest.
We consider it unnecessary, however, to resolve this issue, either under our original fact-finding power, R.R. 1:5-4(b), or by remand to the trial court for additional findings. We have determined, as explained below, that the insurer's conduct following knowledge of Tussel's interest must be deemed *252 a waiver of any possible defenses based on claim of concealment of ownership.

II.
As previously detailed, the plaintiff was first made aware of the interest of Tussel in the Thunderbird at the time of his post-accident statement and that of his sister, which were related to Merchants' investigator. Elaborations of these statements were obtained on September 19, 1958 by another investigator of the insurer. Following service of the summons and complaint in Krebs' death action, which was commenced on October 14, 1958, the papers were forwarded to Gilbert, who in turn sent them to Merchants by registered mail on November 4, 1958. Merchants appointed Francis J. Tansey, Esq. to undertake the defense of Tussel and Jean Eggleston. On November 17, 1958, Tansey filed an answer on their behalf; two days later, he propounded interrogatories to the plaintiff in the death action. On December 19, 1958 he instituted a third-party action against the owner and operator of a vehicle which had allegedly been "drag racing" with the Thunderbird at the time of the collision.
While the present declaratory suit was instituted on January 5, 1959, process was not served on defendants until February 25, and it was not until that time that they were made aware of their insurer's course of action. Meanwhile, Tansey continued to represent Tussel and Jean Eggleston. On February 4 he propounded supplemental interrogatories. On February 11 he wrote to the insureds informing them of receipt of a notice to take their depositions and requesting that they make an appointment to visit his office to answer interrogatories. On February 25 Tansey again wrote to them, as follows:
"Dear Mrs. Eggleston and Mr. Tussel:
On February 11 I wrote asking you to phone me for an appointment to answer interrogatories served upon me. These must be answered by both of you at my office before depositions take place. *253 Unless you immediately contact me, I will advise my client to withdraw from your defense, and the matter will be turned over to you for your action."
Jean Eggleston and Tussel responded promptly to this letter and appeared to answer the interrogatories. On April 4 Tansey received further interrogatories from the death action plaintiff, and instructed and aided defendants in answering them. On November 23, 1959 he represented defendants at the pretrial conference of the death action, and on February 19, 1960, when the depositions of Jean Eggleston and Tussel were taken, Tansey, still employed by Merchants, was present on their behalf.
Two basic issues are raised: (1) whether plaintiff's actions subsequent to the accident and prior to service of the complaint in the instant proceeding amounted to a waiver of its asserted defense under the policy; and (2), if not, whether the service of the pleadings in the declaratory action constitutes an implied notice to the insured of the insurer's reservation of all rights of disclaimer, thereby removing from consideration on the question of waiver any of Tansey's activities following February 25, 1959; or whether, as defendants claim, the institution of the declaratory proceeding along with the continued defense of the primary action  without expressly offering the insureds the choice implicit in a notice of non-waiver  should result in equitable estoppel.
We find it unnecessary to pass on the second question, as we have determined that Merchants' conduct over the nine-month period following the collision and its almost immediate acquisition of the basic facts of ownership represents a solid foundation for the trial judge's holding of waiver of the alleged defense based on such ownership.
Waiver is the voluntary and intentional relinquishment of a known right, operative unilaterally and without regard to reliance by others. West Jersey Title, & Guaranty Co. v. Industrial Trust Co., 27 N.J. 144, 152-153 (1958); Mattia v. Northern Insurance Co. of New York, *254 35 N.J. Super. 503, 511 (App. Div. 1955). It may take the form of an agreement founded on a valuable consideration, or, as here, it may constitute a clear, unequivocal and decisive act showing such a purpose as to amount to estoppel in pais. Aron v. Rialto Realty Co., 100 N.J. Eq. 513, 518 (Ch. 1927), affirmed 102 N.J. Eq. 331 (E. & A. 1928). The intention to waive need not be stated expressly, but may be spelled out from a state of facts exhibiting full knowledge of circumstances producing a right and continuing indifference to the exercise of that right. Thus, where the insurer has complete knowledge of facts giving rise to a defense under the policy but nonetheless continues unequivocally to treat the policy as operative and to undertake the defense of the insured, it is held to have waived its right later to assert that defense. Cook v. Preferred Accident Ins. Co., 114 N.J.L. 141 (E. & A. 1935); O'Dowd v. United States Fidelity & Guaranty Co., 117 N.J.L. 444 (E. & A. 1937); Suydam v. Public Indemnity Co., 10 N.J. Misc. 868, 161 A. 499 (Sup. Ct. 1932); Caiola v. Aetna Life Insurance Co., 13 N.J. Misc. 845, 181 A. 524 (Sup. Ct. 1935), affirmed 116 N.J.L. 381 (E. & A. 1936). See 5A Am. Jur., supra, § 132, p. 133.
The basic facts concerning Tussel's purchase of the Thunderbird were revealed to Merchants, through its agent, within several weeks of the May 12, 1958 accident date. Any doubt or confusion with respect thereto was certainly dispelled at the time of the second phase of the plaintiff's investigation, namely on September 19, 1958, when all parties concerned freely related the circumstances surrounding the purchase and the reasons for placing ownership in Jean Eggleston's name. Nevertheless, plaintiff waited until suit had been instituted and discovery proceedings were well under way before indicating in any fashion to the insureds an intention to disclaim liability.
Merchants urges that its legal duty was only to notify the insureds of an asserted policy violation within a reasonable time before trial of the liability action. It seeks to *255 justify its delay on the ground that it was attempting all the while to determine, through independent counsel, whether sufficient grounds existed to void the policy for misrepresentation. Pending this determination, it undertook its contractual obligation "to defend any suit" seeking "damages * * * payable under the terms of [the] policy." Additionally, the assertion is made that the insurer at no time had "full knowledge" of the operative facts, as the investigation statements served merely "to crystalize * * * [its] continued suspicions"; it was "precisely the trial of the fraud claim and the discovery proceedings that would precede the trial that the insurer hoped would result in the disclosure of these facts."
This argument reflects a fixed determination on the part of plaintiff to "play it safe" at the expense of the insureds. Contrary to Merchants' view, the operative facts were fully and completely revealed at the time of the investigations. The only remaining question was the legal effect of these facts. The insurer was obviously not entitled to delay notice to the insured until such time as it had determined to its personal satisfaction the legal efficacy of its suspected defense; not, at least, where it was simultaneously charting the course of the defense of the death action and indeed insisting that the insureds adhere to their policy duties to cooperate in that defense.
Assumption of complete control of the insured's defense, a contractual condition of the insurer's liability, is considered a substantial deprivation and should be timely relinquished when the asserted right of the insurer to avoid liability accrues. This relinquishment generally takes the form of either an express notice of disclaimer, or a reservation of rights by way of a notice of non-waiver of defenses, thereby affording the insured an opportunity to decide whether to engage new counsel or otherwise play a more active role in the defense of the primary action. No such notice or reservation was communicated by plaintiff to defendants  at least until the latter's acceptance of process on February *256 25, 1959, simultaneously with Tansey's letter warning that "unless you immediately contact me, I will advise my client to withdraw from your defense." Assuming arguendo that the declaratory judgment complaint constituted by implication a notice of non-waiver, we conclude that it was not timely made in the evolution of the primary proceeding.
Allstate Insurance Co. v. Altman, 21 Misc.2d 162, 191 N.Y.S.2d 270 (Sup. Ct. 1959), illustrates the sound presumption of prejudice to the insured from unreasonable delay in communication of disclaimer, even though notice is received in advance of trial. There, the carrier had prior to the accident cancelled the policy for non-payment of premiums. However, following the accident, the insurer, without reservation, investigated same, prepared pleadings, and participated in pretrial proceedings. Two months after the accident, the insurer attempted to assert the cancellation. It was held that the cancellation had been waived, and the carrier was estopped from alleging non-coverage of the accident. The court concluded, 191 N.Y.S.2d, supra, at pp. 279-280, that "any other result would be inequitable to the defendant who must be presumed to have been prejudiced by plaintiff's conduct in undertaking the exclusive control of the investigation of the claim and later of the defense of the action in accordance with the terms of the policy, without any reservation of rights."
In United States Casualty Co. v. Melee, 123 N.J. Eq. 256 (E. & A. 1938), the court, though disposing of the appeal on another basis, attributed substantial force to the insured's contention that the insurer, having knowledge  through its investigation reports several days after the accident  of the policy holder's misrepresentation as to sole and unconditional ownership, had waived its right to cancel the policy on that ground when it did not so assert the defense until shortly before the time of trial. Also see Schmidt v. National Automobile & Cas. Ins. Co., 207 F.2d 301, 38 A.L.R.2d 1142 (8 Cir. 1953); National Battery Co. v. Standard Accident Ins. Co., 266 Mo. App. 351, 41 S.W.2d 599 (Ct. App. *257 1931); Miller v. Union Indemnity Co., 209 App. Div. 455, 204 N.Y. Supp. 730 (App. Div. 1924); Reese v. Hartford Accident & Indemnity Co., 4 Misc.2d 947, 163 N.Y.S.2d 326 (Sup. Ct. 1956); Matthews v. Glens Falls Insurance Co., 21 Misc.2d 1079, 192 N.Y.S.2d 811 (Sup. Ct. 1959). 3 Richards, Insurance, supra, § 461, p. 1517. Compare Reliable Newspaper Delivery v. Maryland Casualty Co., 131 N.J.L. 424 (E. & A. 1944), in which a claim of waiver was rejected where the insurer, though delaying a number of months in disclaiming, nevertheless notified the insured almost a year prior to the institution of the negligence suit against the latter.
Thus, while many of the waiver and estoppel holdings, see Annotations, 81 A.L.R. 1326 (1932), 38 A.L.R.2d 1148 (1954), involved delay in disclaimer until or even after the time of trial, it is clear that this is by no means the dividing line. Some of these cases are phrased in terms of equitable estoppel, under which doctrine actual prejudice to the insured must in many jurisdictions be shown. Prejudice enters into the instant analysis only insofar as it bears on the unreasonableness of the insurer's delay following awareness of the operative facts. We think it a sound principle, and so hold, that when the insurer has had full knowledge of all facts giving rise to possible rights of disclaimer before commencement of the primary action against the insured, but nevertheless assumes command of that action without reservation of rights and proceeds to file all necessary pleadings and to engage in discovery maneuvers, it has embarked on a firm commitment which must reasonably be construed as a waiver of those rights.
Affirmed.