730 A.2d 434 (1999)
322 N.J. Super. 124
Corrine S. BELFER, Executrix of the Estate of Norbert Belfer, individually and as a shareholder of Lighting World, Inc., Plaintiff-Respondent/ Cross-Appellant[1],
v.
Linda K. MERLING, Bruce Belfer, Elaine Belfer, Christine Weiss, Donald Davenport and Lighting World, Inc., Defendants-Appellants/ Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued March 29, 1999.
Decided June 16, 1999.
*437 Alan M. Lebensfeld, Red Bank, for defendants-appellants/cross-respondents (Lebensfeld, Borker & Sussman, attorneys; Mr. Lebensfeld and Lawrence J. Sharon, on the brief).
Samuel Feldman, Roseland, for plaintiff-respondents/cross-appellants (Orloff, Lowenbach, Stifelman & Siegel, attorneys; Mr. Feldman and Craig A. Ollenschleger, on the brief).
Before Judges HAVEY, PAUL G. LEVY and LESEMANN. *435
*436 The opinion of the court was delivered by PAUL G. LEVY, J.A.D.
These appeals arise from a dispute among family members of a closely held corporation, Lighting World, Inc. The two principals of the company, plaintiff Norbert Belfer and defendant Linda Merling, were divorced after a thirty year marriage. The couple executed a property settlement agreement (PSA) that was incorporated into the judgment of divorce. The PSA was essentially a shareholders agreement for Lighting World, giving each party a one-half ownership interest in the company, but allowing plaintiff to be chief executive officer (CEO) for the "foreseeable future." The agreement also created a deadlock committee to deal with situations where the couple could not agree on major decisions and to forestall resort to the courts.
Things ran relatively smoothly for almost four years following the divorce. Then, plaintiff and his son Bruce, who was president of the company, had a dispute when plaintiff told Bruce he was discharged as president. That dispute triggered a meeting of the deadlock committee, and the committee took certain actions which plaintiff thought were designed to oust him as CEO. He immediately filed suit in Superior Court, seeking remedies under New Jersey's oppressed minority shareholder statute (N.J.S.A. 14A:12-7). Defendants (plaintiff's son, daughter, and former wife) counterclaimed, alleging that plaintiff had misappropriated corporate funds, and seeking an order barring him from participating in the company as an employee, director, or officer.
Following a lengthy trial, the General Equity judge found that plaintiff was not an oppressed shareholder and that, under the terms of the PSA, it was time for him to relinquish his duties as CEO. However, *438 the judge did rule in his favor with respect to certain monies due him from a shareholder loan account. Partial counsel fees were awarded to his former wife, but no other request for fees was granted.
Both sides now appeal the counsel fee order. In addition, defendants appeal from the amount awarded plaintiff under his shareholder loan account, and from the judge's post-judgment refusal to credit defendants with amounts they allege were inadvertently paid to plaintiff following entry of the judgment.
We conclude that no counsel fees should have been awarded, and in that limited respect, the judgment is vacated. However, in all other respects the judgment is affirmed.
Plaintiff incorporated Lighting World, Inc. in 1968, and both he and his wife worked for the business. The company flourished, and in the late 1980s, its annual sales were between two and three million dollars.
Norbert and Linda separated in 1988, and two years later they executed a comprehensive PSA. Pursuant thereto, they waived alimony and Linda conveyed some of her stock to plaintiff so that each would own half the outstanding stock. The parties agreed to devise their interests in the company to their three children, Bruce, Elaine and Marc. The couple's older son, defendant Bruce Belfer, became a full-time employee in 1982 and was named a director in 1988. Their daughter, defendant Elaine Belfer, became a full-time employee in 1988.
Significant to this appeal, the parties agreed in the PSA that plaintiff "shall continue for the foreseeable future as the Chief Executive Officer of Lighting World, Inc." and that he "shall be responsible for the day to day operations of said corporation." Although Linda was to continue to be employed by the company, she "shall not continue to be involved in the day to day operations of said corporation." She was, however, allowed to have access to the company's books and to attend stockholder meetings as well as meetings of the Board of Directors.
In addition, the parties agreed that:
Nothing contained in this paragraph shall prevent the husband, as Chief Executive Officer, from making policy decisions concerning the direction of the corporation, the setting of salaries, or the entrance of the corporation into various contracts and ventures, both domestic and foreign with the following exceptions which shall be undertaken only with the consent of the wife:
a. The entry, by the corporation, into any long term leases (five (5) years or more in length).
b. The pledging of the corporation's assets or extension of credit on behalf of another entity in excess of $200,000.
c. The sale or acquisition of capital assets by the corporation in excess of $200,000.
The determination of bonuses shall be made jointly by husband and wife.
The parties recognize that the ownership of the stock on a 50-50 basis between the parties may result in a deadlock over some future policy or action as outlined above, or over the general direction of the corporation as examined at one of the semi-annual stockholders meetings. If said deadlock cannot be resolved between the parties, then the question or issue shall be submitted to a committee to resolve the deadlock, the decision of said committee being binding on both parties.
The Deadlock Committee shall consist initially of the retained accountant for the corporation and the parties' two children, Bruce and Elaine, who are now actively working for the corporation....
It is the intention of the parties to avoid, if possible, the dissolution of the corporation by court order, by reason of a complaint filed by either party in a court of competent jurisdiction concerning *439 a deadlock over the corporation's operation.
The other two paragraphs of the PSA which have relevance to this appeal are the following:
38. In the event of any dispute arising out of this Agreement or the performance thereof, the husband and wife agree that attempts should be made to settle their dispute by Agreement before using the Courts for any determination.
39. Should either the husband or the wife fail to abide by the terms of this Agreement, the defaulting party will indemnify the other for all reasonable expenses and costs, including counsel fees, incurred by the other in successfully enforcing this Agreement.
The judgment of divorce was entered on September 4, 1990, incorporating this agreement by reference.
According to Mitchell Leckstein, plaintiff's matrimonial attorney, the "watershed" issue in the divorce was who was going to run the company. Once it was decided that plaintiff would run the company, it was assumed that he could run it indefinitely. Linda merely wanted safeguards in place so that plaintiff could not deprive her of her investment. Both parties acknowledged that their children would some day be in a position to run the company but they did not know if they would agree on when that would occur.
Leckstein further acknowledged that neither party wanted the children to have control over them or to be able to take sides. Also, neither wanted the company to fall into the hands of a third party such as a new spouse. Although they knew that the business would eventually go to their children, they did not want to commit to a specific date at the time of the divorce.
Linda's matrimonial attorney, Norma Rosenbloom, agreed that the main issue at the time of the divorce was how to give plaintiff control of the company while protecting Linda from unilateral decisions that might affect her income from the company. Linda agreed that she and plaintiff always envisioned their son Bruce taking over the business, but they did not know when he would be ready to do so.
With respect to the deadlock committee, both Leckstein and Rosenbloom recalled that it was the intent of the parties that the committee would have jurisdiction over more issues than just those listed in paragraph seven of the PSA. Those listed were intended only as examples. The parties had in mind major financial decisions on which they could not agree.
After the divorce, Bruce's role in the company expanded. On Bruce's thirtieth birthday, March 13, 1993, plaintiff and Linda agreed to make Bruce president of the company. Once he became president, Elaine became vice-president and chief financial officer.
Bruce immediately put his own "footprint" on the presidency. He started holding weekly breakfast meetings with his executive staff and he handled more executive functions. Plaintiff claimed that Bruce deliberately concealed and excluded him from these weekly meetings. As Bruce took on more roles, plaintiff had less to do and he was able to spend even more time away from the office.
Plaintiff also learned that Bruce was attempting to reassign a company patent to his own name, and to change the name of the company from "Norbert Belfer Lighting Manufacturing" to just "Belfer Lighting Manufacturing." For his part, Bruce claimed that his father became more lackadaisical and frustrated after Bruce became president and that he made no great effort to run the company.
Some time in the beginning of 1994, Bruce broached the idea to plaintiff of Bruce's becoming CEO. According to Bruce, plaintiff agreed. Bruce had papers drawn up, but when he presented them to his father plaintiff said he had no intention of resigning. Plaintiff denied ever telling Bruce that he could become CEO and *440 indicated that such an arrangement would have invalidated the PSA.
On April 1, 1994, Bruce mailed identical packages to plaintiff and Linda, telling his parents that he had paid all of the company's outstanding payables, leaving the company with a huge cash deficit, which meant that many of the checks would bounce. He told his parents that it was "put up or shut up" time and that they each had to help bail out the company.
Each parent was told that the other was lending the company $100,000. On April 19, 1994, when plaintiff was about to deliver his loan to the company, he learned that Linda had not yet made her payment. Plaintiff became enraged and demanded that the bookkeeper reimburse him for the $15,000 he had loaned the company in January ($3000 had already been paid back to him).
While plaintiff waited for his money, Bruce came into his office and explained to his father that Linda was waiting for Norbert's money to be deposited first. Words were exchanged and Bruce stormed out. A short while later, plaintiff noticed that the phones in the office were going unanswered. As he came out of his office, he saw all the employees filing out. Bruce had sent everyone home because "[n]o one has to hear this."
Plaintiff then fired Bruce on the spot for his deception and went back into his office. Bruce called his mother and a police officer he knew. In a few minutes, Linda arrived with the police officer. After words were exchanged, Linda called Donald Davenport, the company accountant, and third member of the deadlock committee, along with Bruce and Elaine, and convened a meeting of that committee.
The committee decided that Bruce was still president of the company, that two signatures would be required on all company checks, and that plaintiff was not allowed to remove any corporate papers from the office. The committee refused to vote on the question of the "foreseeable future"; that is, whether the anticipated time period for plaintiff's control was over and Bruce should replace plaintiff as CEO.
After the police officer left, Bruce came to plaintiff's desk looking for a master key to the office. They had a physical altercation and the police officer returned to the room and arrested plaintiff. A domestic violence complaint was filed, and plaintiff was temporarily restrained from entering the business premises; the complaint was eventually dismissed.
The following day plaintiff received notice that Linda was calling a meeting of the board of directors on April 25, 1994, to discuss the events of April 19. Plaintiff would be allowed to attend by phone. On April 25, 1994, plaintiff filed an order to show cause and verified complaint in the Superior Court. A preliminary injunction was entered, the April 25 meeting was never held, and this litigation ensued.

I. Plaintiff's Loan Account
A great deal of the litigation centered around the money that plaintiff claimed the company owed him. In turn, defendants countered that plaintiff owed the company reimbursement for personal expenses he had wrongfully charged to the company.
Each family member had a loan account. Depending on whether the member was lending money to the company or borrowing from it, the account would be debited or credited. According to Donald Davenport, the company's accountant since 1981, the shareholders of the company were allowed to charge their business expenses against their loan balances. The corporation treated loans from shareholders as legitimate loans on the company books.
The judge found that the company had a practice of declaring bonuses to officers who would then endorse the checks back to the company as loans, thereby infusing it with working capital. That corporate debt would be reduced when the company paid for items that were otherwise personal. *441 Those charges were written off by the company as business expenses thereby reducing the company's tax liability. Everyone agreed to the practice because the tax benefits to the corporation more than offset the increased personal income tax of each family member.
However, as CEO, plaintiff attributed many of his personal expenses to the business of the corporation, rather than charging them to his loan account. It was inferable that Linda, Bruce, and Elaine were aware of this practice.
The court concluded that, until January 1, 1993, defendants tacitly approved of plaintiff's abuse of corporate expenditures for his personal benefit, waived their right to challenge what went on before that date, and were estopped from going back in time. It was not until the 1993 year-end meeting that Elaine brought up the subject and delivered an ultimatum to plaintiff.
The agreed balance of plaintiff's loan account was $126,848 in his favor, and the judge determined that Norbert had charged $18,106 of personal expenses as business expenses. Thus it was held that the corporation owed plaintiff $108,742 from his loan account.
Since everyone, including defendants and the corporation, benefitted from this practice, we agree with the judge that defendants cannot now argue that the loans should be treated any differently by a court. The judge's findings are supported by sufficient credible evidence in the record, and they should not be disturbed on appeal. Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974).

II. Credit for Additional Monies "Mistakenly" Paid
The judgment setting plaintiff's loan account as $108,742 indicated that defendants were entitled to deduct from that amount any repayments of plaintiff's loan from the company's profit sharing plan. While making those calculations, Davenport discovered that the company had paid plaintiff salary and expenses of $25,295 after May 28, 1996. Plaintiff, however, argued that the company had paid him this money without a reservation of rights and that it was now too late for the company to seek an amendment of the judgment on that ground. Defendants argued that they had paid the money to plaintiff by mistake and were entitled to it back. The court ruled that defendants had no right to that further credit and that they were not allowed to correct their own mistake.
We agree. Pursuant to R. 4:49-2, a party has twenty days to seek alteration or amendment of a final judgment. The time period is not subject to enlargement. R. 1:3-4(c). The only exception is for clerical mistakes. R. 1:13-1. Here, any mistake was a substantive one, not clerical.
Moreover, we are not convinced that defendants simply made a mistake in paying plaintiff. This does not appear to be a situation where they found out their bookkeepers had inadvertently paid him. Rather, on October 18, 1996, a full five months after the court rendered its oral opinion, defendants decided that the moment had come to cease paying plaintiff any further salary. That was not an error; it was a corporate decision. In hindsight, defendants' accountant then realized that an argument could be made for recouping that amount.
"It is well settled that money knowingly and voluntarily paid cannot be recovered on the ground there was no liability to pay it in the first instance." Ross Systems v. Linden Dari-Delite, 35 N.J. 329, 334, 173 A.2d 258 (1961). The time for defendants to challenge plaintiff's right to this additional compensation has long passed.

III. The pre-1993 expenses
Defendants contend that the court erred in prohibiting them from seeking *442 recoupment for any personal expenses improperly charged by plaintiff to the company prior to 1993. We disagree.
The judge found that defendants were well aware that plaintiff had attributed many of his personal expenses to the business of the corporation rather than applying them to reduce his loan account. Further, until January 1, 1993, defendants tacitly approved of plaintiff's making corporate expenditures for his personal benefit and thus waived their right to challenge, and were estopped from challenging, what occurred before that date.
Defendants claim that the record did not support a finding of waiver or estoppel, especially on the part of Linda. Linda claims that she did not know that plaintiff was using company money to pay for many of his personal expenses, that plaintiff falsified many of his receipts to make them appear legitimate, and that she objected whenever she discovered such expenditures. Plaintiff's response was always that no one was going to tell him how to spend his own money.
The record supports the finding that no real objection was voiced to plaintiff's spending habits until the meeting at the end of 1993. Shortly after that meeting, Bruce and Elaine presented plaintiff with a plan to reduce his personal spending, but plaintiff rejected the plan out of hand.
Prior to 1993, every family member was charging personal expenses to the company and received the benefits of the company's largesse. Bruce himself admitted that the practice did not change until he became president, in March 1993. Hence, we agree with the judge that defendants are estopped now from challenging a practice to which they never objected and from which they themselves benefitted.
Waiver is the intentional relinquishment of a known right. It implies an election by a party to forego some advantage which he might have otherwise demanded. It "presupposes full knowledge of the right and an intentional surrender," and it "cannot be predicated on consent given under a mistake of fact." County of Morris v. Fauver, 153 N.J. 80, 104-105, 707 A.2d 958 (1998) (citation omitted). However, an intention to waive need not be manifested expressly but may be spelled out from a state of facts exhibiting full knowledge of the circumstances producing a right and continuing indifference to exercise of that right. Merchants Indem. Corp. v. Eggleston, 68 N.J.Super. 235, 254, 172 A.2d 206 (App.Div.1961), aff'd, 37 N.J. 114, 179 A.2d 505 (1962).
Judicial estoppel is a preclusion by law against the taking of a position inconsistent with that previously assumed and intended to influence the conduct of another, if such repudiation would not be responsive to the demands of justice and good conscience and would work prejudice and injury to another. Heuer v. Heuer, 152 N.J. 226, 237, 704 A.2d 913 (1998). It differs from a waiver in that waiver operates unilaterally without regard to the rights of others or to reliance by others. Merchants v. Eggleston, supra, 68 N.J.Super. at 254, 172 A.2d 206. Based on these principles, defendants are estopped from challenging any of plaintiff's pre-1993 expenditures.

IV. Counsel Fees
Defendants asserted three bases as authority for a counsel fee award. First, the PSA provided that if a party should
fail to abide by the terms of this Agreement, the defaulting party will indemnify the other for all reasonable expenses and costs, including counsel fees, incurred by the other in successfully enforcing this Agreement.
Next, the oppressive minority shareholder statute states:
If the court determines that any party to an action brought under this section has acted arbitrarily, vexatiously, or otherwise not in good faith, it may in its discretion award reasonable expenses, including counsel fees incurred in connection *443 with the action, to the injured party or parties.
[N.J.S.A. 14A:12-7(10).]
Third, the frivolous litigation statute provides:
A party who prevails in a civil action, either as plaintiff or defendant, against any other party may be awarded all reasonable litigation costs and reasonable attorney fees, if the judge finds at any time during the proceedings or upon judgment that a complaint, counterclaim, cross-claim or defense of the nonprevailing person was frivolous.
[N.J.S.A. 2A:15-59.1a(1).]
The judge concluded that plaintiff was not entitled to counsel fees under N.J.S.A. 14A:12-7 because he had not prevailed. Defendants sought counsel fees under that statute because they had prevailed, and under the PSA which provided for a dispute resolution mechanism that plaintiff did not use.
The judge determined that counsel fees should be awarded to defendants pursuant to the frivolous litigation statute, N.J.S.A. 2A:15-59.1, which was implicated by the parties' PSA. In the judge's opinion, that agreement was intended to be a "global resolution" of the marital action and contained a detailed dispute resolution process to resolve differences of opinion concerning corporate policies. The judge reasoned that plaintiff should have used that dispute resolution mechanism as to most of the issues he raised, the only exception being the interpretation of the phrase "foreseeable future." That language was facially ambiguous and required a plenary hearing. Although the court had also ruled against plaintiff on the issues of being an oppressed shareholder, breach of fiduciary duties, abuse of process, and assault, those issues were not "facially frivolous." The certification of services filed by defendants' attorney included time spent on both the frivolous and non-frivolous issues, in the total amount of $329,981.
On appeal, defendants contend that the court erred in awarding them only $65,996 of the fees they incurred in defending against plaintiff's claims and in failing to order counsel fees to the corporation to cover its legal fees. Plaintiff has cross-appealed, arguing that no counsel fees should have been awarded.
Sound judicial administration is best advanced by having each litigant bear his or her counsel fees. Hence, unless attorney's fees are authorized by statute, court rule or contract, they cannot be awarded by a court. Satellite Gateway Communications, Inc. v. Musi Dining Car Co., Inc., 110 N.J. 280, 285, 540 A.2d 1267 (1988). Defendants urge that the above quoted portions of the PSA agreement, N.J.S.A. 14A:12-7 and N.J.S.A. 2A:15-59.1 support their demand for a counsel fee award. We will consider each separately.

(a) Property Settlement Agreement
As a general rule, contracts which permit the aggrieved party to recover fixed or reasonable attorney's fees as part of his or her damages are enforceable unless some larger public policy mandates a contrary result. Center Grove Assocs. v. Hoerr, 146 N.J.Super. 472, 474, 370 A.2d 55 (App.Div.1977). However, any fee arrangement is subject to judicial review as to its reasonableness. Cohen v. Fair Lawn Dairies, Inc., 44 N.J. 450, 452, 210 A.2d 73 (1965).
A claim for attorney's fees pursuant to a contractual agreement is not an award of fees under R. 4:42-9. Rather, it is an element of damages which must be proved in the same manner as any other item and which must be assessed by the finder of fact as a matter of right and in the actual amount established by the proofs. Jennings v. Cutler, 288 N.J.Super. 553, 567, 672 A.2d 1215 (App.Div. 1996). However, expenses can be scaled down by the court to reflect that the attorney's efforts were expended in part on warrantless claims. Cohen v. Fair *444 Lawn Dairies, Inc., 86 N.J.Super. 206, 216-17, 206 A.2d 585 (App.Div.), aff'd 44 N.J. 450, 210 A.2d 73 (1965). When a court enforces an agreement and awards the actual, reasonable, and necessary expenses of the aggrieved party in maintaining the action as part of his or her general damages, the court is merely adjudicating damages for breach of contract. Id. at 215, 206 A.2d 585.
We conclude that the court erred when it found that plaintiff had breached the PSA, thereby entitling Linda to a counsel fee award.[2] Plaintiff contends that the deadlock committee had no jurisdiction to resolve the dispute that occurred on April 19, 1994, as to whether plaintiff could fire Bruce, and that, therefore, plaintiff never breached the PSA by filing suit.
Clearly the deadlock committee would have jurisdiction over more issues than just those listed in paragraph seven of the PSA, but it is just as clear that the committee was not intended to resolve such matters as whether the CEO of the company could fire the president. Since the PSA specifically gave plaintiff, as CEO, the right and authority to run the day-to-day operations of the company, unless and until the board of directors voted him out as CEO, he was free to fire Bruce without calling the deadlock committee. Hence, to the extent that the judge suggested that the dispute resolution mechanism of the PSA was intended to resolve all differences of opinion concerning corporate policies, we disagree. Furthermore, it was not disputed that the deadlock committee voted to enjoin plaintiff from taking corporate documents with him, that defendants stood idly by as plaintiff was put under arrest for domestic violence, that Linda convinced the arresting officer to allow her to seize plaintiff's briefcase containing personal documents, that Bruce decided to change the locks on the company's doors, and that Linda called a special meeting of the board of directors, one of the purposes of which was to restrain plaintiff from operating the company. Under these circumstances, plaintiff had little choice but to seek relief in the Superior Court and the PSA does not prohibit that action.
The PSA merely says that the parties agree that attempts shall be made to settle any dispute arising out of the agreement before using the courts for any determination. Given the events that transpired between April 19 and 25, 1994, it is fair to conclude that neither party made an attempt to settle their dispute, and any such attempt would have been futile. Plaintiff was entitled to react to an apparent anticipatory breach of the PSA. Ross Systems v. Linden Dari-Delite, supra, 35 N.J. at 341, 173 A.2d 258. Once Linda unilaterally called a meeting of the board which plaintiff was permitted to attend only by phone, he was entitled to seek relief in other forums.
We conclude that there was no breach of the PSA, so the agreement could not be a basis for a counsel fee award, and the award to Linda based on plaintiff's breach of the PSA is vacated.

(b) Frivolous Litigation Statute
N.J.S.A. 2A:15-59.1 is the primary basis for the court's award of counsel fees. Plaintiff contends that the court erred in awarding any fees under this statute, and defendants contend that once it was determined that fees were warranted, the court abused its discretion in reducing the amount sought.
Although defendants did not specifically seek fees under this statute, the judge *445 found that the statute was implicated by the PSA. That is, because that agreement was intended to be a "global resolution" of the marital action, and because it contained its own detailed dispute resolution process which plaintiff failed to use, it could be said that his litigation was frivolously brought. While defendants prevailed on the issues of oppressed shareholder, breach of fiduciary duties, abuse of process and assault, those issues were not determined to be "facially frivolous." Instead, fees were to be allowed for issues that should have been resolved under the PSA but which instead were litigated, those being the oppressed shareholder and the compelled buy-out claims. The judge found there was no way to segregate the legal services rendered on these two claims, and he allocated twenty percent to them as a reasonable approximation. Unfortunately there is some inconsistency in the court's analysis, most strikingly in allowing fees for oppressed shareholder claims that were found to be not "facially frivolous." Moreover, the standard to determine frivolousness is more strict.
The term "frivolous" as used in the statute must be given a restrictive interpretation. McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 561, 626 A.2d 425 (1993). This is in recognition of the principle that citizens should have ready access to all branches of government, including the judiciary. Rosenblum v. Borough of Closter, 285 N.J.Super. 230, 239, 666 A.2d 1006 (App. Div.1995), certif. denied, 146 N.J. 70, 679 A.2d 656 (1996). The statute should not be allowed to be a counterbalance to the general rule that each litigant bears his or her own litigation costs, even when there is litigation of "marginal merit." Venner v. Allstate, 306 N.J.Super. 106, 113, 703 A.2d 330 (App.Div.1997).
A claim will be deemed frivolous or groundless when no rational argument can be advanced in its support, when it is not supported by any credible evidence, when a reasonable person could not have expected its success, or when it is completely untenable. Fagas v. Scott, 251 N.J.Super. 169, 189, 597 A.2d 571 (Law Div.1991) (citation omitted). False allegations of fact will not justify a fee award unless they are made in bad faith, for the purpose of harassment, delay, or malicious injury. McKeown-Brand v. Trump, supra, 132 N.J. at 561, 626 A.2d 425. When the plaintiff's conduct bespeaks an honest attempt to press a perceived, though ill-founded and perhaps misguided, claim, he or she should not be found to have acted in bad faith. Id. at 563, 626 A.2d 425.
Here, the judge never found that false allegations of fact had been made, much less that they had been made in bad faith for the purposes of harassment or delay. The only two claims found to be frivolousthe oppressed shareholder and the compelled buy-out claimswere found to be frivolous solely because the parties' PSA provided an alternate dispute resolution mechanism for them. We conclude that that fact alone cannot justify a finding of frivolous action.
More significantly, these two claims were not even the focus of the fourteen-day trial. Rather, the trial centered on whether plaintiff could be forced out as CEO (the "foreseeable future" issue) and on the amount due plaintiff under his loan account. The court ultimately awarded Linda only twenty percent of her counsel fees, finding that to be a fair allocation of the time spent by on the two frivolous issues. However, the court admitted there was no precise way to separate out the charges. It used a twenty percent figure, mistakenly relying on what it perceived to be defendants' suggestion. When the court realized its mistake, it indicated that this figure nevertheless represented an accurate assessment of the time spent on the frivolous issues.
Another serious problem here is that the so-called frivolous issues were not severable from the non-frivolous ones. That is, time spent litigating the oppressed shareholder *446 and compelled buy-out claims overlapped with time spent litigating the "foreseeable future" question and the issue of the jurisdiction of the deadlock committee. In sum, a court was required to interpret the shareholder provisions of the PSA and determine their respective rights. Thus plaintiff's overall complaint could not be deemed frivolous.

(c) Oppressed minority shareholder statute
The judge's reliance on the oppressed minority shareholder statute as a basis for awarding counsel fees was noted only in a footnote without any accompanying explanation. Plaintiff contends no fees should have been awarded because he had a good faith, legitimate claim that his family was trying to squeeze him out of his own company. Defendants contend that plaintiff showed bad faith in bringing this action.
N.J.S.A. 14A:12-7(10) requires a finding of arbitrariness, vexatiousness, or lack of good faith. This does not mean that every corporation which wins an oppressive shareholder suit may be awarded fees. Bad faith must also be proved. Here, it could be said that plaintiff acted unreasonably in assuming that he could control the company without regard to the wishes of the other shareholder (Linda) and the other board members (Bruce, Elaine, and Linda). He also acted unreasonably in thinking that he could force Linda to buy his shares or to sell her shares to him, especially in light of the parties' matrimonial agreement which operated as a shareholders' agreement for all intents and purposes.
Nevertheless, we cannot say that he acted arbitrarily, vexatiously, or without good faith. Plaintiff had built up the business for thirty years, and the record does not support a finding that he acted in bad faith merely by acting to prevent himself from being frozen out of his own company. While ultimately he did not prevail in preventing that from occurring, that is not the same as saying that he acted arbitrarily, vexatiously, or without good faith. Thus, counsel fees cannot be sustained under N.J.S.A. 14A:12-7.

(d) Corporation's Counsel Fees
Defendants contend that the court erred in refusing to reimburse the corporation for the legal fees it incurred during the litigation or for the fees incurred by Davenport once he was appointed by the court as the company's provisional director. We disagree.
Primarily, the corporation was not entitled to indemnification under the terms of the parties' PSA because it was not a party to that contract. Additionally, just as the individual defendants were not entitled to counsel fees under either the oppressed minority shareholder statute or the frivolous litigation statute, neither was the corporation. As to Davenport's fees, even if plaintiff had invoked the deadlock committee, the corporation might have had to pay Davenport, or someone else, as an interim director until the dispute could be resolved. It is clear that Davenport was not appointed due to plaintiff's arbitrariness, vexatiousness, or bad faith in bringing suit. Until the court could properly construe the phrase "foreseeable future" and determine whether plaintiff could remain as CEO, someone had to run the company. Accordingly, we reject defendants' arguments regarding the company's counsel fees and costs.
In sum, the judgment is affirmed in all respects except the counsel fee awards which are vacated.
NOTES
[1] .Following the death of Norbert Belfer, we granted the motion of his executrix to be formally substituted as plaintiff. All references to plaintiff, however, will be to Norbert Belfer.
[2] Defendants contend that plaintiff is not allowed to challenge the court's findings in this regard because he never appealed from any portion of the judgment other than the counsel fee award. Defendants are incorrect. Appeals are taken from judgments, not from the opinions supporting those judgments. Glaser v. Downes, 126 N.J.Super. 10, 16, 312 A.2d 654 (App.Div.1973), certif. denied, 64 N.J. 513, 317 A.2d 726 (1974). As long as plaintiff properly appealed from that portion of the judgment awarding defendants counsel fees, he is free to challenge any finding by the court which supported that award.