**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4562-18

CAJOECO LLC, CAJOECO LLC PROFIT SHARING TRUST, CAJOECO LLC PROFIT SHARING PLAN, JEST TEXTILES, INC., JEST TEXTILES, INC. DEFINED BENEFIT PLAN AND TRUST, NORMAN MAIS, individually, as Trustee, Administrator and/or Beneficiary of Cajoeco LLC Profit Sharing Trust and as Trustee, Administrator and/or Beneficiary of Jest Textiles, Inc. Defined Benefit Plan and Trust, CARMEN MAIS, individually and as Trustee, Administrator and/or Beneficiary of Cajoeco LLC Profit Sharing Trust,

     Plaintiffs-Appellants/
     Cross-Respondents,

v.

BENSI ENTERPRISES, LLC, BENSI OF OLD TAPPAN, LLC, BENSI OF OLD BRIDGE, LLC, BENSI OF HAMILTON, LLC, BENSI RESTAURANT GROUP, INC., BENSI MANAGEMENT ASSOCIATES, LLC, BENSI

DEVELOPMENT GROUP LLC, BENSI INC., BENSI OF CLIFTON, LLC, BENSI OF DENVILLE, LLC, BENSI OF ENGLISH VILLAGE, LLC, BENSI OF FLEMINGTON, LLC, BENSI OF GILLETTE, LLC, BENSI OF GLOUCESTER, LLC, BENSI OF HAMPTON, LLC, BENSI OF HASBROUCK HEIGHTS, LLC, BENSI OF HH, LLC, BENSI OF HILLSDALE, INC., BENSI OF MANSFIELD, LLC, BENSI OF NORTH ARLINGTON, INC., CENTANNI RISTORANTE, LLC, BENSI OF PARAMUS PARK, LLC, BENSI OF ROSELAND, LLC, BENSI OF ROXBURY, LLC, BENSI OF WHIPPANY, LLC, SCALOPINI OF WHIPPANY, LLC, BENSI OF WHITEHOUSE STATION, LLC, BENSI OF WYOMISSING, LLC, AJO MANAGEMENT, LLC, TPR RESTAURANT PIZZERIA, INC., JOHN OSSO, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent, NANCY OSSO, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent, ELSA OSSO, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent, JORGE RAMIREZ, individually, as limited liability company member

A-4562-18

and/or manager, and as shareholder, officer, director, or corporate agent, OSCAR BENITEZ, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent, ROBERT DaSILVA, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent, JAMES KELLY, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent, FRANCESCO BERNARDO, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent, DENISE DiMEGLIO, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent,

Defendants-Respondents,

and

BENSI OF NORTH BRUNSWICK, LLC, BENSI OF GARWOOD, LLC, RUDY'S OF GARWOOD, LLC, BARBARA BEN-YISHAY, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent, MARIO BERNARDO, individually, as limited liability company member

3

and/or manager, and as shareholder, officer, director, or corporate agent, ARI BEN-YISHAY, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent, JOSE DARIO FERNANDEZ, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent, CLEMENTE OSSO, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent, and, RIZZIERO OSSO, individually, as limited liability company member and/or manager, and as shareholder, officer, director, or corporate agent,

    Defendants-Respondents/
    Cross-Appellants.

_____

ARI BEN-YISHAY,

    Plaintiff,

v.

NORMAN MAIS,

    Defendant.

_____

Submitted March 8, 2021 – Decided June 17, 2021

4

Before Judges Rothstadt and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket Nos. L-3477-16 and L-6139-16.

Diktas Gillen, P.C., attorneys for appellants/cross-respondents (Christos J. Diktas, of counsel; Michael L. Kingman and Christine Gillen, on the briefs).

Sills Cummis & Gross, P.C., attorneys for respondents/cross-appellants Rizziero Osso and Mario Bernardo (Joseph B. Fiorenzo and Andrew W. Schwartz, of counsel and on the briefs).

Robert G. Ricco, attorney for respondent/cross-appellant Ari Ben-Yishay.

Frederic C. Goetz, attorney for respondent/cross-appellant Clemente Osso.

PER CURIAM

Plaintiffs appeal from the March 21, 2019 dismissal of their complaint on summary judgment. Four defendants cross-appeal from the motion judge's May 10, 2019 denial of their motion for fees and sanctions.[1] The parties dispute arose from plaintiffs' unsuccessful investments in a restaurant franchise. Plaintiffs'

---

[1] Although plaintiffs sued numerous individuals and entities, this appeal and cross-appeal involve only individual defendants John Osso, his nephew Rizzerio "Rick" Osso, John's brother-in-law Mario Bernardo, John's youngest brother Clemente "Clem" Osso, and an unrelated investor, Ari Ben-Yishay. We refer to the individual plaintiffs and the Osso family individual defendants by their first names to avoid any confusion caused by their common last names.

complaint asserted numerous claims, including fraud, misrepresentation, breach of contract, conversion, unjust enrichment, negligence, conspiracy, and tortious interference with contractual relations. The motion judge, Robert G. Wilson, issued the orders under appeal, setting forth his reasons for the dismissal of the complaint in a thorough and comprehensive forty-seven-page opinion on March 21, 2019, and for the denial of the motion for fees and sanctions in a written decision dated May 10, 2019.

On appeal, plaintiffs assert that "credibility issues" and "available inferences" should have resulted in the denial of summary judgment. The cross appealing defendants assert that frivolous litigation sanctions should have been awarded because there was no merit to any of plaintiffs' claims.

We have considered the parties' contentions in light of the record and the applicable principles of law. We affirm the orders under appeal substantially for the reasons stated by Judge Wilson in his written decisions.

## I.

We summarize the facts from the record leading to plaintiffs' failed investments and their ensuing claims, viewed in the light most favorable to plaintiffs as the parties who opposed the entry of summary judgment. Ben Elazar v. Macrietta Cleaners, Inc., 230 N.J. 123, 135 (2017).

Plaintiffs' Investments

In an earlier unpublished opinion relating to the same failed investments, we described plaintiffs as follows:

> Plaintiffs, Norman and Carmen Mais, are spouses, former owners of plaintiff Jest Textiles, Inc. (Jest), the current owners of plaintiff Cajoeco, LLC (Cajoeco), and the administrators and beneficiaries of the two companies' retirement and profit sharing plans, plaintiffs Defined Benefit Plan and Trust (Jest Plan), Cajoeco LLC Profit Sharing Plan (Cajoeco Plan), and Cajoeco LLC Profit Sharing Trust (Cajoeco Trust).
>
> [Cajoeco LLC v. Benefit Plans Admin. Servs., No. A-4364-16 (App. Div. April 25, 2019) (slip op. at 1-2).]

Norman was solely responsible for directing the investments and loans at issue in this litigation and he used, in part, funds taken from his companies' plans. He had no experience in owning or operating restaurants.

The investments at issue arose from Norman's relationship with his friend John.[2] The two became friends through Norman's frequenting of a restaurant that John owned and operated with others between 1983 and 2004.

_____

[2] On November 27, 2018, John filed for bankruptcy in the United States Bankruptcy Court for the District of New Jersey (Case No. 18-33328). Accordingly, all claims against him were stayed pending resolution of his bankruptcy proceeding. 11 U.S.C. § 362(a). Upon the filing of this appeal, plaintiffs' counsel advised our clerk that all of the claims against John were

In 2004, John sought to expand his businesses by forming defendant Bensi Enterprises, LLC (Bensi Enterprises) and soliciting investors through a Private Placement Memorandum (PPM). Bensi Enterprises sought to raise $4.5 million by offering for sale 30,000 units of Class B membership interests at $150 per unit seeking to raise a total of $4.5 million.[3] About $3 million was ultimately raised through sale of the Class B units. The PPM contained explicit warnings about the risk of investing in Bensi Enterprises, including the loss of all investment funds. The PPM recommended investors perform their own

resolved in the bankruptcy proceeding and that plaintiffs dismissed their claims against him in this action.

[3] The investment plan under the PPM called for Bensi Enterprises to act as a holding company for individual LLC's that owned various Bensi restaurants. There were to be two classes of shareholders, Class A and Class B. Only Class A members had voting rights. 70,000 Class A units were previously issued to the "founding members" of Bensi Enterprises. Their contribution was to total approximately $1,925,000 while Class B members total investment was to be approximately $4,000,000.

The PPM identified the founding members as John, who held 40,000 Class A units, Rick, Bernardo, and defendants Jorge Ramirez, and Oscar Benitez. John recruited the other Class A members to assist him in operating the business, based upon their skills and experience, and it was his decision to describe them as "founding members." Although Class A members were to contribute approximately $1,925,000, many of them, including John, never made their total contribution and instead made partial payments and delivered promissory notes for the balance.

A-4562-18

investigations and evaluations of the investment, including consulting with legal, financial, and accounting advisors. At all times, as the majority holding Class A member and Managing Member of Bensi Enterprises, John controlled the business.

Because he trusted John, in August 2004, without reading the PPM or Bensi Enterprise's operating agreement, Norman made an initial investment of $210,000 into Bensi Enterprises, purchasing 1,400 Class B units. Later, Bensi Enterprises offered new Class AA units at $115 per unit to Class B members on a pro rata basis, seeking to raise an additional $3,450,000. On March 9, 2007, Norman purchased 1,500 Class AA units, investing an additional $172,500 in Bensi Enterprises.

Norman invested without seeking any independent legal or financial advice, understanding there was a "high degree of risk of loss." Moreover, he understood that John would be in charge and make the ultimate decisions for the business. Also, Norman did not rely upon any representations made by anyone else, including any of the other individual defendants. He relied only on his conversations with John.

A-4562-18

After the 2004 investment, Bensi Enterprises opened new Bensi restaurants in multiple locations.[4] John managed each of the restaurants through his company, defendant Bensi Restaurant Group, Inc. (BRG). John was BRG's sole shareholder and President. In exchange for these services, each restaurant was required to pay BRG a management fee.

In 2007, John decided to open larger Bensi restaurants in "lifestyle shopping centers." The investment model for these restaurants was different than that used for those owned by Bensi Enterprises. Each of these restaurants was to be a separate entity, owned directly by investors, with John being the majority owner and manager of each entity. Bensi Enterprises had no ownership interest in these second-generation Bensi restaurants.[5]

Norman made initial investments totaling approximately $1,632,500 in these new Bensi restaurants, again relying solely on his conversations with John and without reviewing any documents or seeking professional advice. Between 2008 and 2014, and again without reading any documents or consulting with anyone but John, Norman made additional loans of $560,000 to John and

---

[4] The locations included Garwood, Gillette, Roxbury, Roseland, Whippany, Paramus, Clifton, Mansfield, English Village, and Wyomissing.

[5] These restaurants were located in Old Bridge, North Brunswick, Flemington, Hamilton, Old Tappan, Gloucester, and Hampton, Virginia.

A-4562-18

approximately $345,000 to specific Bensi restaurants. All the loans were undocumented, unsecured, and based on "handshake" agreements.

The Individual Defendants

Rick, Clem, and Ben-Yishay worked or invested in the restaurants or related companies. Specifically, Rick was a fourteen percent Class A shareholder in Bensi Enterprises, worked as the general manager of Bensi of Wayne, and was a part-owner in some of John's restaurants unrelated to Bensi Enterprises.

Rick also served as Director of Operations at BRG between 2004 and 2011. In that capacity, he primarily supervised operations for several Bensi restaurants, but he was not involved in the transfer of funds for any of the Bensi entities.

Clem was not an investor in Bensi Enterprises but held an ownership interest in three individual restaurants. He was also employed by BRG between August 2006 and August 2012, handling bookkeeping, payroll, and tax reporting for the various Bensi restaurants. While working at BRG, Clem met with the business's accountants and was designated on BRG bank account documents as chief financial officer of the company; however decision-making responsibility

A-4562-18

or authority remained solely with John. In 2013, months after he left BRG's employment, Clem worked part-time for two Bensi restaurants.

Ben-Yishay, a medical doctor, was a Class B and Class AA minority shareholder in Bensi Enterprises, having invested a total of $1,687,500. He also invested $2,035,750 in eight individual Bensi restaurants. In addition, he made loans to Bensi Enterprises, John, and some of the restaurants that totaled at least four million dollars. According to Ben-Yishay, he lost more than $6,000,000 to the Bensi entities and John.

Beginning in 2008, the Bensi venture began to struggle, causing its bank accounts to be overdrawn. In response to the overdrawn accounts, John directed intercompany loans and fund transfers to cover the shortages.

Ben-Yishay later learned business was not good. He retained an accountant, Gary Levy, who specialized in hospitality related businesses, to evaluate the viability of the businesses and whether to fund future investments.

Levy determined that BRG's records were "very poorly put together," and the reporting system for the various restaurants was inconsistent, "incomplete, inaccurate, [and] very hard to decipher to make any type of business assessment off of it. Inconsistency between what the books, the chart of accounts, what an income statement would say on one restaurant would be different than how it

12

would be on another."  Levy recommended that Ben-Yishay not invest or loan any additional funds to the businesses.

In 2010, BRG retained Levy and later another consultant in the industry, Michael Jacobs, to make recommendations on improving cash flow.  In a November 2, 2010 email sent to investors, including Norman, John stated that he had retained Levy "to help us institute better controls and reporting," and was "in the process of acting on many of [his] recommendations."  While John accepted Levy's recommendation to bring in an operations consultant, he rejected closing unprofitable restaurants.  Jacobs similarly recommended that John implement certain operational changes, and close eight unprofitable restaurants to cut losses.  He also recommended that John proceed with his plans to sell two restaurants to raise cash.  John did not agree with Jacobs's recommendations.

Instead of following the recommendations, John opened new restaurants.  Ultimately, John opened additional Bensi restaurants, stopping only when the bank ceased issuing loans.

All of the businesses suffered cash flow shortages as a result of operational losses and a lack of equity capital.  To cover cash flow shortages, John transferred funds between various entities, including BRG, providing

13

money to individual restaurants even though the restaurants were supposed to pay management fees to BRG.

John attributed the failure of the Bensi venture to economic downturn in 2009-2010, which resulted in a failure of certain strip-malls with Bensi locations. Conversely, plaintiffs alleged the failure was attributable to undercapitalization, commingling of funds, failure to follow corporate formalities, and mismanagement.

## The Litigation

In 2016, plaintiffs filed their complaint, which they later amended three times. In counts one and two of the third amended complaint, plaintiffs asserted claims for legal and equitable fraud, and negligent misrepresentation. In count three, they alleged breach of contract, asserting that the operating agreements of Bensi Enterprises and the individual Bensi restaurants constituted contracts, and the individual defendants breached the contracts "[b]y their fraudulent conduct and self-dealing." In count four, plaintiffs asserted a claim for breach of the implied covenant of good faith and fair dealing, premised upon the same alleged contracts and same alleged misconduct.

In count five, plaintiffs alleged that the individual defendants, as officers, managers, and promoters of the Bensi venture, breached fiduciary duties of

14

loyalty and their obligation to transact the business of the Bensi venture with the highest degree of care, good faith, and integrity, and to act at all times in accordance with the applicable law and the best interests of the company and its members, and particularly to refrain from fraud and self-dealing.

In count six, plaintiffs asserted claims of conversion, corporate waste, and self-dealing against defendants individually and collectively, premised upon the alleged undercapitalization of the Bensi entities; self-dealing; mismanagement and promotion of preferred insiders; commingling funds between the Bensi entities; and misappropriation, transfer, and conversion of the assets of the Bensi entities to plaintiffs' detriment and for defendants' exclusive benefit.

Plaintiffs seventh count asserted a claim for unjust enrichment, alleging: that "each of the Bensi entities, the founders, promoters, management team, preferred insiders and those conspiring with/aiding and abetting them have been unjustly enriched at the expense and to the detriment of plaintiffs." In count eight they claimed negligence, premised upon the same misconduct alleged in prior counts of the complaint. In count nine, they asserted defendants "conspired and agreed between and among themselves to accomplish, aid or abet the transfer of the assets of and/or membership units in the various Bensi entities."

15

In count ten (incorrectly designated eleven), plaintiffs claimed tortious interference with contract, premised upon the same misconduct as alleged in prior counts. In count twelve (incorrectly designated thirteen), plaintiffs asserted claims for indemnification and contribution and that the individual defendants were not entitled to the protections of the corporate veil because the various Bensi entities acted as a single entity.

Rick, Clem, and Ben-Yishay filed responsive pleadings, including cross claims, denying liability. Ben-Yishay also filed a separate suit against Norman seeking repayment of a loan he made that Norman used at John's request to infuse cash into one restaurant. Norman filed an answer denying liability and Ben-Yishay's suit was consolidated with plaintiffs' matter.

## Discovery

Norman did not dispute he relied solely upon John's statements in making the investments and loans. However, plaintiffs still alleged the individual defendants engaged in a pattern of undercapitalization, commingling of funds, failure to follow corporate formalities, and mismanagement. Plaintiffs claimed their investments and loans were transferred to other entities to cover "cash flow shortfalls," pay expenses, and "make distributions to members of related entities."

According to Norman, the distributions he received on his investments were akin to Ponzi-type payments because they were made "without regard for the true financial condition of the entities."  Plaintiffs explained that Bensi Enterprises reported losses for 2005 through 2014, yet it made distributions for the years 2005 through 2009 using money from new investors and borrowings from businesses owned by the corporation.

Norman also claimed that the individual defendants should have informed him about Levy's and Jacob's recommendations and the financial problems the businesses were experiencing.  He claimed that had he been made aware of these issues, he would not have made the investments or loans at issue.

However, Norman acknowledged that he was warned of the business's financial difficulties.  Despite that knowledge, Norman made no attempt to investigate, review any financial documents, or take any steps to monitor the status of his investments.  Norman trusted and supported John until 2014.  Their relationship broke down only when John asked Norman for an additional loan of $150,000, which Norman declined when John refused to provide collateral for the loan.

Plaintiff's allegations as to the individual defendants other than John were also based upon Norman's perception that he was being treated differently than

A-4562-18

the other investors. For example, as to Ben-Yishay, plaintiffs challenged a 2009 consolidation of Bensi Enterprises's and John's $2,750,000 indebtedness to Ben-Yishay into a single promissory note and Ben-Yishay's 2011 agreement to forebear from pursuing collection on the note in exchange for John's agreement to collateralize the loan with equity positions in various restaurants, including a location in North Brunswick. Later, when the indebtedness was not being repaid, and John told Norman and Ben-Yishay that the North Brunswick restaurant in which they had invested could not pay its rent and needed an infusion of cash, John disclosed that his equity in the business was already pledged to Ben-Yishay as collateral. When, under the advice of counsel, Ben-Yishay refused to loan John more money, Ben-Yishay ultimately agreed to make a $110,000 loan to Norman, which Norman then loaned to John together with an additional $55,000.

When John defaulted on the North Brunswick restaurant's debt in October 2012, Ben-Yishay ended up owning ninety percent of the restaurant, leaving plaintiffs with a ten percent interest, as memorialized in an amended operating agreement that Norman's wife Carmen signed on behalf of the Cajoeco Plan. John later transferred his interest in another location in Hillsdale, giving Ben-Yishay a sixty percent interest in that location and leaving the remaining

18

investors with forty percent. Ben-Yishay essentially ended up owning one restaurant but the North Brunswick restaurant he invested in with Norman failed without Norman repaying his loan from Ben-Yishay.

Ben-Yishay ultimately lost a total of $6,372,750 as a result of his investments and loans, including: $2,950,000 in combined loans to Bensi Enterprises and John; $1,687,000 in equity purchases in Bensi Enterprises; and $1,735,750 in equity purchases in various Bensi restaurants.

Plaintiffs' allegations against Rick related to his 2011 purchase of Bensi of Garwood. Plaintiffs' experts opined that this transaction was structured in a way that was detrimental to Bensi Enterprises, and therefore harmful to plaintiffs as shareholders of Bensi Enterprises.

At the time Bensi of Garwood was formed in 2004, Bensi Enterprises owned a fifty-five percent membership interest in the restaurant. Six years later, in May 2010, Rick purchased 500 units and became a part-owner of Bensi of Garwood through a private placement memorandum. In 2011, after John unsuccessfully attempted to sell Bensi Enterprises's interest in Bensi of Garwood to one of the restaurant's suppliers, John asked Rick if he would be interested in purchasing Bensi Enterprises's fifty-five percent membership

A-4562-18

interest in Bensi of Garwood for $800,000 and selling to John his interests in three other locations.[6]

Thereafter, John and Rick negotiated the terms of sale for Bensi of Garwood over a period of months, with both sides represented by counsel. In September 2011, the transaction closed with a purchase price of $660,000, structured to include some cash payments and some assumption of debt, and Rick relinquishing his interest in Bensi Enterprises. Thereafter, Rick owned Bensi of Garwood with defendant Jose Dario Fernandez, and the restaurant was renamed Rudy's of Garwood, LLC.

Norman admitted that John advised him of the Garwood transaction, albeit not the details, and Norman understood Rick was no longer involved in the Bensi venture. After September 27, 2011, Rick had no further involvement with Bensi Enterprises or any of the Bensi restaurants.

<u>Summary Judgment and Frivolous Claim Motions</u>

In February 2019, various defendants including Rick, Clem, and Ben-Yishay filed motions for summary judgment, which plaintiffs opposed. Ben-Yishay also sought summary judgment on his claim against Norman.

---

[6] The sale of the Garwood location was one of the two restaurant sales recommended by Jacobs.

A-4562-18

Judge Wilson heard arguments on March 1, 2019, and on March 21, 2019, he issued a single opinion and multiple orders granting the summary judgment motions and dismissing plaintiffs' claims.[7]  Judge Wilson concluded that many of the causes of action pled in the third amended complaint failed for lack of standing because they were derivative claims and, regardless of standing, for lack of proof on the elements of each claim.  Specifically, the judge found fraud was not specifically pleaded as required by Rule 4:5-8 and there was no evidence that Rick, Clem, or Ben-Yishay made misrepresentations to plaintiffs to support the fraud-based claims, especially because Norman never relied on representations other than those made by John.  Similarly, there were no contracts between plaintiffs and the individual defendants to support the contract-based claims.  As to the remaining claims, the judge provided a detailed explanation as to why they were without any merit.

---

[7] On April 1, 2019, the judge entered another order:  (1) continuing the stay of all claims against John; (2) accepting Ben-Yishay's voluntary dismissal of his claims against Norman; (3) dismissing Clem's counterclaims for lack of prosecution; and (4) accepting plaintiffs' voluntary dismissal of their remaining claims against every corporation and LLC defendant except Bensi of North Brunswick and Bensi of Hillsdale.  On April 4, 2019, he entered an amended order, accepting the voluntary dismissal of plaintiffs' remaining claims against two individual defendants.

A-4562-18

Thereafter, Rick, Bernardo, Clem, and Ben-Yishay, filed motions for sanctions under the Frivolous Claims Act, N.J.S.A. 2A:15-59.1, and Rule 1:4-8, which plaintiffs opposed. By opinion and orders dated May 10, 2019, the judge denied the motions. These appeals followed.

## II.

On appeal, plaintiffs generally allege that the summary judgment record contained sufficient facts for inferences to be drawn that established Rick, Clem, and Ben-Yishay's liability as to each count of their complaint.[8] As plaintiffs aver in their single brief point, "While it is convenient to defendants that one version of the events which transpired stars John [] as the single minded mastermind of all of the schemes which defrauded plaintiffs, reasonable inferences from available evidence, much of which is undisputed, can also lead to the conclusion that each of the [individual defendants] aided and abetted John." We disagree.

---

[8] We note that although Bernardo was served with a copy of plaintiff's notice of appeal, the notice of appeal indicates plaintiffs are appealing the judge's grant of summary judgment only as it pertains to Rick, Clem, and Ben-Yishay.

A-4562-18

A.

We begin our review by addressing plaintiffs' challenge to Judge Wilson's award of summary judgment. We review a grant of summary judgment using the same standard that governs the motion judge's decision. RSI Bank v. Providence Mut. Fire Ins., 234 N.J. 459, 472 (2018) (citing Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)). Under that standard, summary judgment will be granted when "the competent evidential materials submitted by the parties," viewed in the light most favorable to the non-moving party, show that there are no "genuine issues of material fact" and that "the moving party is entitled to summary judgment as a matter of law." Grande v. Saint Clare's Health Sys., 230 N.J. 1, 23-24 (2017) (quoting Bhagat, 217 N.J. at 38); accord R. 4:46-2(c). "An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Id. at 24 (quoting Bhagat, 217 N.J. at 38). We owe no special deference to the motion court's legal analysis or its interpretation of a statute. RSI Bank, 234 N.J. at 472; Hitesman v. Bridgeway, Inc., 218 N.J. 8, 26 (2014).

23

B.

Standing

Judge Wilson first concluded that summary judgment was warranted because plaintiffs lacked standing as their alleged losses could only be addressed through a shareholder's derivative action. In doing so, he noted the "special injury" exception, which permits shareholders to pursue individual claims where they suffered a wrong not suffered by all shareholders generally, and explained that the Revised Uniform Limited Liability Company Act's (RULLCA) "provisions regarding standing to bring a cause of action are similar to established principles of corporation law." He concluded that any claims belonged to the various Bensi corporate entities that suffered harm as a result of John's misdeeds and, "if allegedly misappropriated funds were recovered, they would go to the business entity, and following that perhaps to . . . equity holders. The Plaintiffs would not be solely entitled to such funds."

Plaintiffs argue they were entitled to pursue the lost value of their investments in Bensi Enterprises, and seven individual Bensi restaurants, which they alleged ultimately closed due to breach of fiduciary duty on the part of corporate officers through corporate waste, mismanagement, and negligence. We disagree.

A-4562-18

The issue of standing is a legal one, reviewed de novo. <u>Tully v. Mirz</u>, 457 N.J. Super. 114, 123 (App. Div. 2018). "A corporation is regarded as an entity separate and distinct from its shareholders," <u>ibid.</u> (quoting <u>Strasenburgh v. Straubmuller</u>, 146 N.J. 527, 549 (1996)), and, as a matter of corporate law, suits by shareholders to redress injuries to the corporation, which secondarily harm all shareholders alike, must be pursued as derivative actions on behalf of the corporation; individual shareholders may not recover for the injury to their investments alone.[9] <u>Strasenburgh</u>, 146 N.J. at 549-50. <u>Accord</u> <u>Delray Holding, LLC v. Sofia Design & Dev. at S. Brunswick, LLC</u>, 439 N.J. Super. 502, 510 (App. Div. 2015); <u>Pepe v. Gen. Motors Acceptance Corp.</u>, 254 N.J. Super. 662, 666 (App. Div. 1992). The "[r]easons of policy and practicality" that "underlie the principle," include "maintaining the investment resources of the corporation, avoiding a multiplicity of suits, providing equal benefit for all shareholders and avoiding partial dividends or partial liquidation." <u>Strasenburgh</u>, 146 N.J. at 549-

---

[9] The RULLCA restricts the ability of an LLC member to assert claims that belong to the LLC. N.J.S.A. 42:2C-67 to -68. In that respect, it is similar to corporation law, which restricts a corporation's shareholder from asserting claims of the corporation. <u>See</u>, <u>e.g.</u>, <u>Delray</u>, 439 N.J. Super. at 510 (noting that "[s]hareholders in a corporation may only sue individually when they suffer a 'special injury'"; that is to say, some injury distinct from that suffered by all shareholders in the corporation).

50. However, courts may in some instances waive the requirement that claims be pursued in a derivative action, including in the context of closely held corporations.[10] Tully, 457 N.J. Super. at 125, 127; Brown v. Brown, 323 N.J. Super. 30, 36-38 (App. Div. 1999).

Plaintiffs' claims in counts five, six and eight allege classic causes of action that must be pursued as derivative claims. Strasenburgh, 146 N.J. at 551-52; Tully, 457 N.J. Super. at 126-27. The losses suffered by the corporations as a result of the alleged misconduct were incurred by corporate shareholders of Bensi Enterprises generally, not specially by plaintiffs. Thus, these allegations should have been pursued in the form of derivative claims. Under N.J.S.A. 42:2C-67 an LLC member pursuing an individual claim must "plead and prove an actual or threatened injury that is not solely the result of an injury suffered . . . by the limited liability company" when the member seeks to "maintain a direct action against another member, a manager, or the limited liability company to

---

[10] The court may do so if it finds that doing so "will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons." Tully, 457 N.J. Super. at 125 (quoting Principles of Corporate Governance: Analysis and Recommendations, § 7.01(d) (Am. Law Inst. 1992)). See also N.J.S.A. 42:2C-68(a) (stating an LLC member "may maintain a derivative action to enforce a right of a limited liability company" if demand is made and "the managers or other members do not bring the action within a reasonable time").

enforce the member's rights and otherwise protect the member's interests, including rights and interests under the operating agreement or [the] act or arising independently of the membership relationship." (Emphasis added). See also Delray Holding, 439 N.J. Super. at 510 (requiring plaintiffs to show "special injury" in the LLC context).

Nevertheless, to the extent plaintiffs' remaining causes of action against the individual defendants for breach of contract, fraud, misrepresentations, and withholding of information that influenced Norman's investment decisions arose from plaintiffs suffering special damages, plaintiffs had standing to pursue them in this action. See Strasenburgh, 146 N.J. at 552; Tully, 457 N.J. Super. at 126.

### Fraud, Equitable Fraud, and Negligent Misrepresentation

"Although the word 'fraud' is used in common parlance to connote any practice involving shady or underhanded dealing, in the law it is a term of art with a clear definition." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 175 (2005). A claim of fraud requires proof of: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Id. at 172-73 (quoting

27

Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997)); Jewish Ctr. of Sussex Cnty. v. Whale, 86 N.J. 619, 624 (1981).

A plaintiff seeking to prove equitable fraud is required to establish the same elements, save for the elements of knowledge of the falsity and an intention to obtain an undue advantage. Jewish Ctr., 86 N.J. at 625. Also, a successful equitable fraud claim will yield only equitable relief, and not monetary damages. Ibid.; Enright v. Lubow, 202 N.J. Super. 58, 72 (App. Div. 1985). A claim of negligent misrepresentation requires proof of "[a]n incorrect statement, negligently made and justifiably relied upon, [and] . . . injury sustained as a consequence of that reliance." Green v. Morgan Props., 215 N.J. 431, 457 (2013) (alterations in original) (quoting H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 334 (1983)).

Finally, under Rule 4:5-8(a): "In all allegations of misrepresentation, fraud, mistake, breach of trust, willful default or undue influence, particulars of the wrong, with dates and items if necessary, shall be stated insofar as practicable. Malice, intent, knowledge, and other condition of mind of a person may be alleged generally."

Here, Judge Wilson properly dismissed plaintiffs' claims based on fraud and misrepresentation. The third amended complaint did not contain any details

about the alleged misrepresentations by Rick, Clem, or Ben-Yishay, as required under Rule 4:5-8(a). Furthermore, the summary judgment record is devoid of any allegation that these individual defendants made any affirmative misrepresentations to plaintiffs, or that plaintiffs detrimentally relied upon affirmative misrepresentations made by these individuals. To the contrary, Norman testified that he relied exclusively upon his communications with John in making investments in, and loans to, John and the Bensi entities.

Plaintiffs also allege Rick, Clem, and Ben-Yishay fraudulently withheld information from plaintiffs, including, for example, John's failure to fully capitalize the various Bensi corporations, his mismanagement of the various Bensi businesses and intermingling of funds between corporations, the poor financial status of the corporations, the retention of Levy and Jacobs and their recommendations, and the transfer of certain restaurants to Rick and Ben-Yishay. However, plaintiffs never established that these individual defendants had any affirmative duty to provide such information to plaintiffs.

In terms of fraudulent withholding of information, the record reflects that Norman communicated almost exclusively with John, who specifically notified Norman about the retention of Levy, as well as the transfers of restaurants to Rick and Ben-Yishay. Moreover, it was John who controlled all business

decisions, including capitalization of the corporations and the alleged intermingling of funds between corporate entities. Thus, to the extent there were any misrepresentations made to plaintiffs by virtue of a failure to provide complete and accurate information about these subjects, the record reflects that those misrepresentations were made by John, and not the individual defendants. See, e.g., Walid v. Yolanda for Irene Couture, Inc., 425 N.J. Super. 171, 180-86 (App. Div. 2012) (finding sufficient evidence to support fraud claim premised upon seller's misrepresentation to purchaser of business's financial status and withholding of complete and accurate information).

Breach of Contract and Breach of the Implied Covenant
of Good Faith and Fair Dealing

The judge also properly granted summary judgment as to plaintiffs' contract claims. In order to maintain their cause of action for breach of contract or breach of the implied covenant of good faith, plaintiffs had to minimally demonstrate there was a contract between them and the individual defendants. Proving breach of contract requires plaintiffs to show that the parties entered into a valid contract containing certain terms, defendants failed to perform their obligations under the contract, and plaintiffs sustained damages as a result. Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016). Additionally, as every contract contains an implied covenant of good faith and fair dealing, providing

that neither party will do anything that has the effect of destroying or injuring the rights of the other party to receive the benefits of the contract, a claim for breach of the covenant also requires proof of a contract. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997).

Here, the summary judgment record does not support these causes of action because, as found by Judge Wilson, there is no evidence of any contractual relationship between plaintiffs and the individual defendants other than the loan from Ben-Yishay to Norman, and the evidence shows no breach of that contract other than the breach by Norman, who failed to repay the loan.

Even if, as plaintiffs argue, we viewed the operating agreements as contracts, there is still no evidence to support plaintiffs' causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. Plaintiffs did not share any ownership interests with Clem, and there was therefore no relationship between them pursuant to a corporate operating agreement. Plaintiffs shared membership interests with Rick and Ben-Yishay in Bensi Enterprises. However, the Bensi Enterprises operating agreement vested John, as the "Managing Member" of the LLC, with exclusive authority to manage the LLC. See N.J.S.A. 42:2C-37(a) (stating an LLC is manager-managed if the operating agreement indicates as such). Thus, Bensi Enterprises

31

was manager-managed, and the operating agreement did not establish any obligations between and among its members. Rather, all such obligations were imposed upon John. N.J.S.A. 42:2C-39(i).

Plaintiffs also had a shared membership interest with Ben-Yishay in Bensi of North Brunswick. Until October 2012, this business was managed exclusively by John, and Ben-Yishay had no fiduciary obligation to plaintiffs. N.J.S.A. 42:2C-37(c) and -39(i). After October 2012, the restaurant was managed by Ben-Yishay. However, plaintiffs have not identified any breach of contract or the covenant of good faith and fair dealing by Ben-Yishay during the time of his management, and the record does not reflect any such breach. Under these circumstances, the dismissal of plaintiffs' contract claims in summary judgment was correct.

Conversion, Corporate Waste, and Self-Dealing

In granting summary judgment dismissing plaintiffs' claims of conversion, waste, and self-dealing, Judge Wilson noted that the claims of corporate waste and self-dealing were shareholder derivative claims that could not be pursued by plaintiffs individually. Putting aside the standing issue, the judge found that Ben-Yishay was a passive investor and creditor, and not a business "insider," potentially liable for these claims. To the extent that after October 2012 Ben-

Yishay was the managing member of Bensi of North Brunswick, in which plaintiffs were invested, the record reflected that Ben-Yishay "was forthright and honest with [Norman]" and, in winding down the restaurant, received only funds that were due to him as a secured creditor.

Regarding Rick, the judge found his involvement was limited to his purchase of Bensi Enterprises's ownership interest in Bensi of Garwood. The judge found that the record did not establish any valid claim for corporate waste relating to this transaction, as there was no proof that the consideration Rick paid for the restaurant was unreasonable. He also rejected any claim of self-dealing with respect to the Bensi of Garwood transaction for the same reasons, and because any claim was appropriately pursued against John, who negotiated the transaction at arms-length with Rick.

Finally, regarding Clem, the judge found that he did not owe plaintiffs any fiduciary duty, and there was no nexus between Clem and the alleged acts of conversion, corporate waste, and self-dealing.

Conversion is defined as the intentional exercise of dominion or control over another's property that is inconsistent with the owner's rights. Bondi v. Citigroup, Inc., 423 N.J. Super. 377, 431 (App. Div. 2011); LaPlace v. Briere, 404 N.J. Super. 585, 595 (App. Div. 2009). The property at issue may be money,

33

promissory notes, or other forms of securities, but the funds must be identifiable and must clearly belong to the injured party. Bondi, 423 N.J. Super. at 431-32.

Corporate waste is defined as "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 173 (2011) (quoting Lewis v. Vogelstein, 699 A.2d 327, 336 (Del. Ch. 1997)). Finally, self-dealing may constitute a breach of the fiduciary duty of loyalty. Kaye v. Rosefielde, 223 N.J. 218, 230 (2015).

Here again Judge Wilson correctly concluded that plaintiffs did not have standing to pursue these claims. Even if they did, only John owed any duty to plaintiffs, since the record is undisputed John exclusively controlled the Bensi entities, including those in which plaintiffs were invested. N.J.S.A. 42:2C-37 and -39. Thus, only John could be held liable for self-dealing. Furthermore, the summary judgment record reflects that only John engaged in the misconduct about which plaintiffs complain.

Regarding Clem, the summary judgment record contains no evidence that he played any role in the acts about which plaintiffs complain, even assuming that he was the CFO of BRG, as plaintiffs assert. He did not share any corporate ownership interests with plaintiffs, nor was he invested in Bensi Enterprises or

34

any of the individual restaurants in which plaintiffs were invested.  Moreover, the record contains no evidence of any transfer of corporate assets by or to Clem. Therefore, plaintiffs cannot sustain any individual claims against him for conversion, corporate waste, or self-dealing.

Regarding Ben-Yishay, the record does not reflect that he engaged in any acts of conversion, corporate waste, or self-dealing.  The record reflects that he was not actively involved in managing Bensi Enterprises, or any restaurant in which plaintiffs were invested, other than Bensi of North Brunswick in 2012.

Reviewing the record as it relates to Ben-Yishay's October 2012 acquisition of a majority interest in Bensi of North Brunswick, there is no evidence that it was anything but beneficial to Bensi Enterprises, which unburdened itself of a failing restaurant as well as a substantial amount of debt, which Ben-Yishay forgave.  Nor is there any evidence that the transaction was beneficial to Ben-Yishay at plaintiffs' expense.  To the contrary, Ben-Yishay lost his investment in Bensi of North Brunswick when the restaurant failed, as well as some of the money he had loaned to the entity, notwithstanding that he was a secured creditor.  The record also reflects that Ben-Yishay was transparent in dealing with plaintiffs in his management and winding down of Bensi of

North Brunswick. He did not engage in any conversion, corporate waste, or self-dealing.

Finally, regarding Rick, the only act about which plaintiffs complain that could conceivably be perceived as conversion, corporate waste, or self-dealing is his purchase of Bensi Enterprises's ownership interest in Bensi of Garwood. The summary judgment record reflects that this transaction was the result of a months-long, arms-length negotiation between John and Rick, with both sides represented by counsel.

The record does not support a conclusion that Rick paid less than a fair value for the business. At most, plaintiffs' experts' analysis suggested that the transaction was structured in such a way as to benefit John individually, at the expense of Bensi Enterprises, in that John allegedly wrongfully transferred funds that were paid by Rick to BRG rather than Bensi Enterprises and did not repay certain promissory notes that were used to reimburse Rick for his having relinquished his equity interests in certain Bensi entities. The experts also suggested that in completing the transaction, John ignored a certain individual's ownership interest in Bensi of Garwood; however, there is no allegation this was harmful to plaintiffs. The dismissal of these claims against the individual defendants on summary judgment was appropriate.

## Unjust Enrichment

We also conclude that the dismissal of plaintiffs' unjust enrichment claims was correct. A claim for unjust enrichment requires proof that defendants "received a benefit and that retention of that benefit without payment [to plaintiffs] would be unjust." Thieme v. Aucoin-Thieme, 227 N.J. 269, 288 (2016) (quoting Iliadis v. Wal-Mart Stores, Inc., 191 N.J. 88, 110 (2007)). It is a claim grounded in quasi-contract doctrine, requiring proof that plaintiffs expected remuneration from defendants for a benefit conferred upon them, and that failure of remuneration would unjustly enrich "defendants beyond [their] contractual rights." Ibid.

For the reasons previously discussed, there is no evidence supporting a conclusion that Rick, Clem, or Ben-Yishay unjustly enriched themselves at the expense of plaintiffs. To the contrary, the record contains no evidence that Rick paid anything other than fair market value for Bensi of Garwood, and no corporate assets were transferred to Clem and that Ben-Yishay lost a great deal of money from his investments in and loans to the various Bensi entities and his loan to Norman.

37

Negligence

Judge Wilson also correctly dismissed plaintiffs' negligence claims. A claim for negligence requires proof that defendants owed plaintiffs a duty of care, defendants breached that duty causing injury to plaintiffs, and resulting damages. Shields v. Ramslee Motors, 240 N.J. 479, 487 (2020); J.H. v. R&M Tagliareni, LLC, 239 N.J. 198, 218 (2019). As previously discussed, the entities in which plaintiffs were invested were managed exclusively by John, and therefore, only John owed any duties to plaintiffs. N.J.S.A. 42:2C-37 and -39. Without owing a duty, the individual defendants could not have been negligent.

Furthermore, the record does not support plaintiffs' contention that Rick and Clem owed plaintiffs any duty due to their allegedly holding executive-level positions at BRG. In that capacity, Rick and Clem were subordinate to John, who wholly owned and operated BRG and exclusively managed BRG and all other Bensi entities. There is no evidence in the record that Rick or Clem had any decision-making authority with respect to any Bensi entity, or that they exercised any supervisory or oversight authority over John. See, e.g., Francis v. United Jersey Bank, 87 N.J. 15, 28-45 (1981) (allowing for personal liability in negligence of corporate director who breached her duty to provide oversight of corporate affairs and policies).

A-4562-18

Even if we accept the existence of a duty, plaintiffs have not produced any evidence that any individual defendant but John breached a duty owed to them. The record contains no evidence of tortious conduct in which Rick, Clem, or Ben-Yishay participated. Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 303-09 (2002) (addressing potential liability of corporate officers for their participation in corporation's tortious conduct). Finally, as previously discussed, the record does not reflect that Ben-Yishay breached any duty owed to plaintiffs after assuming control of Bensi of North Brunswick.

Conspiracy, and Aiding and Abetting a Conspiracy

"In New Jersey, a civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" Banco Popular, 184 N.J. at 177 (quoting Morgan v. Union Cnty. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993)); LoBiondo v. Schwartz, 199 N.J. 62, 102 (2009). The gist of the claim is the underlying wrong, absent which there would be no liability, and not the agreement to commit the wrong. Banco Popular, 184 N.J. at 177-78.

To establish liability, it is enough that a defendant "understand the general objectives of the scheme, accept them, and agree . . . to do [his or her] part to further them." Banco Popular, 184 N.J. at 177 (quoting Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir. 1988)). Circumstantial evidence of an agreement is sufficient. Morgan, 268 N.J. Super. at 365. Finally, "[c]ivil conspirators are jointly liable for the underlying wrong and resulting damages." Banco Popular, 184 N.J. at 178.

The summary judgment record contains no evidence that Clem engaged in any preferential transfer of assets or ownership interests in any Bensi entity, or that he engaged in a conspiracy to do so. Also, the record does not reflect that Rick's acquisition of Bensi of Garwood, or Ben-Yishay's acquisitions of Bensi of Hillsdale and Bensi of North Brunswick, were unlawful, obtained through unlawful means, or the result of a conspiracy to inflict a wrong or injury upon plaintiffs, or upon the shareholders generally. To the contrary, the record reflects that these transactions were negotiated at arms-length between the parties' attorneys, and Bensi Enterprises received substantial value from these transactions in the form of cash and cancellation or transfer of debts. This is true notwithstanding plaintiffs' expert's assertion that John did not fulfill his end

of the bargain with respect to the Bensi of Garwood transaction, thereby allegedly causing harm to Bensi Enterprises.

## Tortious Interference with Contract

We conclude there is no merit to plaintiffs' claims of tortious interference with a contract. "To establish a claim for tortious interference with contractual relations, a plaintiff must prove: (1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage." Dello Russo v. Nagel, 358 N.J. Super. 254, 268 (App. Div. 2003). Accord Nostrame v. Santiago, 213 N.J. 109, 122 (2013).

Here, plaintiffs have not identified any contract with which the individual defendants allegedly interfered. Furthermore, plaintiffs' allegations of interference are unfounded because the record reflects that the alleged improper acts were committed by John, and not by Rick, Clem, or Ben-Yishay.

## Indemnification and Contribution

Plaintiffs' claims that the Judge Wilson erred by dismissing their claims for indemnification and contribution are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We simply note the judge's decision was legally correct. See N.J.S.A. 2A:53A-3 (describing contribution);

41

T & E Indus. v. Safety Light Corp., 123 N.J. 371, 397-98 (1991) (describing indemnification).

Breach of Fiduciary Duty

Judge Wilson also correctly granted summary judgment dismissing plaintiffs' breach of fiduciary duty claims after finding no evidence that Rick, Clem, or Ben-Yishay were in a dominant or superior position such that they owed plaintiffs a fiduciary duty, or that these defendants breached any such duty. Elsewhere in the opinion, the judge found that the term "founder" used in the 2004 PPM had "no legal significance" because only John had control over Bensi Enterprises and its financial affairs. He also found no preferential transfers to Clem, Rick, or Ben-Yishay.

The judge's conclusions are supported by the law and the factual record. The law does not impose a fiduciary duty upon Rick, Clem, or Ben-Yishay to the extent they had shared membership interests with plaintiffs—which Clem did not. To the contrary, as previously discussed, members of a limited liability company that is manager-managed do not owe each other fiduciary duties. N.J.S.A. 42:2C-39(i). Only John, who was identified as the managing member of Bensi Enterprises, owed any fiduciary duty to plaintiffs. N.J.S.A. 42:2C-37 and -39(i).

The common law also does not support imposition of a fiduciary duty upon Rick, Clem, or Ben-Yishay. Fiduciary duties are imposed where necessary to protect the vulnerable from exploitation and abuse by those in a superior, dominant, or controlling position. McKelvey v. Pierce, 173 N.J. 26, 57 (2002); F.G. v. MacDonell, 150 N.J. 550, 563 (1997).

Here, however, the only defendant who was in a superior, dominant, or controlling position with respect to plaintiffs was John. Even accepting plaintiffs' contention that Rick and Clem held executive-level positions at BRG, the record reflects that they did not make any of the decisions about which plaintiffs complain. Rather, John had complete control over business decisions made for all Bensi entities, and these defendants had no authority to oversee or countermand those decisions.

The only exception is that Ben-Yishay arguably owed a fiduciary duty to plaintiffs during the time he managed Bensi of North Brunswick. However, as previously discussed, the summary judgment record does not contain any evidence that Ben-Yishay breached any duty owed to plaintiffs.

Finally, even if we accepted that these individual defendants owed plaintiffs a fiduciary duty, for the reasons previously discussed, the record does

43

not support plaintiffs' contentions about alleged preferential transfers of corporate ownership interests or assets to these defendants.

## Piercing the Corporate Veil

A corporation is a separate entity from its shareholders, and a primary reason for incorporation is to insulate shareholders from the corporation's liabilities. State, Dep't of Env't Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983). Therefore, courts generally will not pierce the corporate veil, absent extraordinary circumstances such as fraud or injustice. Ibid. The party seeking to pierce the corporate veil "bears the burden of proving that the court should disregard the corporate entity." Tung v. Briant Park Homes, Inc., 287 N.J. Super. 232, 240 (App. Div. 1996). Accord Richard A. Pulaski Constr. Co. v. Air Frame Hangars, Inc., 195 N.J. 457, 472-73 (2008).

Piercing the corporate veil is not a mechanism by which legal liability is imposed; rather, it is an equitable remedy employed "to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law." Ventron Corp., 94 N.J. at 500 (citations omitted); see also Verni ex rel. Burstein v. Harry M. Stevens, Inc., 387 N.J. Super. 160, 199 (App. Div. 2006).

A-4562-18

The summary judgment record suggests it might be appropriate to pierce the corporate veil and potentially impose liability upon John individually for failing to adequately capitalize the corporate entities, disregarding for the entities' corporate forms, altering of shareholder ownership interests without documentation, and using corporate funds for personal expenses. Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 394 (App. Div. 1989) (noting that "New Jersey courts have . . . pierced the corporate veil of a closely held corporation to impose liability on the owner individually"); see also Sean Wood, LLC v. Hegarty Group, Inc., 422 N.J. Super. 500, 517-19 (App. Div. 2011) (piercing corporate veil to hold owner personally liable where owner used corporation as alter ego). Whether John committed these acts to perpetrate a fraud or injustice presents a debatable question of fact, but not one that would prevent the award of summary judgment to the other individual defendants—especially since the record is clear that these defendants did not perpetrate nor benefit from any of the alleged misconduct.

III.

We turn to the cross-appeal filed by Rick, Bernardo, Clem, and Ben-Yishay in which they contend Judge Wilson erred in denying their motions for counsel fees and sanctions under the frivolous litigation statute, N.J.S.A. 2A:15-59.1, and Rule 1:4-8. We disagree.

In his opinion denying defendants' motions for sanctions, the judge found that plaintiffs' claims were not frivolous as defined by N.J.S.A. 2A:15-59.1. He found that plaintiffs did not bring their claims in bad faith, as there was no indication of malicious intent or wrongful purpose. He further found that plaintiffs' claims were initially founded on credible information, and they were well-grounded in established law, notwithstanding the judge's ultimate conclusion that they should be dismissed on summary judgment.

We review the judge's ruling for an abuse of discretion, considering whether he applied the correct law, considered the relevant and appropriate factors, and whether the judge's ruling reflects a clear error of judgment. Bove v. AkPharma Inc., 460 N.J. Super. 123, 146 (App. Div.), certif. denied, 240 N.J. 7 (2019); Ferolito v. Park Hill Ass'n, 408 N.J. Super. 401, 407 (App. Div. 2009).

N.J.S.A. 2A:15-59.1(a)(1) provides:

> A party who prevails in a civil action, either as plaintiff or defendant, against any other party may be awarded

all reasonable litigation costs and reasonable attorney fees, if the judge finds at any time during the proceedings or upon judgment that a complaint, counterclaim, cross-claim or defense of the nonprevailing person was frivolous.

The term "frivolous" is defined at N.J.S.A. 2A:15-59.1(b), which provides:

> In order to find that a complaint, counterclaim, cross-claim or defense of the nonprevailing party was frivolous, the judge shall find on the basis of the pleadings, discovery, or the evidence presented that either:
>
> (1) The complaint, counterclaim, cross-claim or defense was commenced, used or continued in bad faith, solely for the purpose of harassment, delay or malicious injury; or
>
> (2) The nonprevailing party knew, or should have known, that the complaint, counterclaim, cross-claim or defense was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.

Rule 1:4-8 also permits the imposition of sanctions against counsel for filing frivolous pleadings. United Hearts, LLC v. Zahabian, 407 N.J. Super. 379, 389 (App. Div. 2009); Masone v. Levine, 382 N.J. Super. 181, 192-93 (App. Div. 2005). Specifically, Rule 1:4-8(a) provides:

> (a) The signature of an attorney . . . constitutes a certificate that the signatory has read the pleading,

written motion or other paper. By signing, filing or advocating a pleading, written motion, or other paper, an attorney . . . certifies that to the best of his or her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) the paper is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the factual allegations have evidentiary support or, as to specifically identified allegations, they are either likely to have evidentiary support or they will be withdrawn or corrected if reasonable opportunity for further investigation or discovery indicates insufficient evidentiary support; and

(4) the denials of factual allegations are warranted on the evidence or, as to specifically identified denials, they are reasonably based on a lack of information or belief or they will be withdrawn or corrected if a reasonable opportunity for further investigation or discovery indicates insufficient evidentiary support.

The burden of proof rests with the party seeking sanctions. Ferolito, 408 N.J. Super. at 408. In general, however, courts should interpret both N.J.S.A. 2A:15-59.1 and Rule 1:4-8 restrictively, recognizing the principle that litigants should have ready access to the courts, and as a general matter, litigants should

bear their own costs, even when their claims have little merit. <u>Tagayun v. AmeriChoice of N.J., Inc.</u>, 446 N.J. Super. 570, 580 (App. Div. 2016); <u>Belfer v. Merling</u>, 322 N.J. Super. 124, 144 (App. Div. 1999). "Sanctions should be awarded only in exceptional cases." <u>Tagayun</u>, 446 N.J. Super. at 580.

"A claim will be deemed frivolous or groundless when no rational argument can be advanced in its support, when it is not supported by any credible evidence, when a reasonable person could not have expected its success, or when it is completely untenable." <u>Belfer</u>, 322 N.J. Super. at 144. Even "[f]alse allegations of fact will not justify a fee award unless they are made in bad faith, for the purpose of harassment, delay, or malicious injury." <u>Ibid.</u> "When the plaintiff's conduct bespeaks an honest attempt to press a perceived, though ill-founded and perhaps misguided claim, he or she should not be found to have acted in bad faith." <u>Id.</u> at 144-45.

Furthermore, litigants are permitted to rely upon their counsel in evaluating the legal sufficiency of their claims. <u>Ferolito</u>, 408 N.J. Super. at 408. That some allegations made at the outset of the litigation ultimately prove to be unfounded does not render frivolous a complaint that also contains non-frivolous claims. <u>First Atl. Fed. Credit Union v. Perez</u>, 391 N.J. Super. 419, 432 (App. Div. 2007). Thus, "a grant of a motion for summary judgment in favor of a

defendant, without more, does not support a finding that the plaintiff filed or pursued the claim in bad faith." Ferolito, 408 N.J. Super. at 408. Accord McKeown-Brand, 132 N.J. at 563. "Sanctions for frivolous litigation are not imposed because a party is wrong about the law and loses his or her case." Tagayun, 446 N.J. Super. at 580.

Here, the record reflects that, in denying the motion for sanctions, Judge Wilson applied the correct law and considered the relevant factors, and his ruling does not reflect a clear error of judgment. Accordingly, there was no abuse of discretion.

We add only the following. Defendants take issue with plaintiffs' choice to assert claims against them as individuals, particularly noting Norman's inability to identify any fraudulent or negligent misrepresentations made by them. However, even if the fraud and negligent misrepresentation claims were meritless, the remaining claims still needed to be resolved. In this regard, to the extent plaintiffs sought to pierce the corporate veil and require the disgorgement of proceeds from the alleged fraudulent transfer of corporate assets, it was not unreasonable to bring suit against the other shareholders in the various Bensi corporations, the corporate officers who allegedly assisted or conspired in the

50

wrongdoing, and the parties to the alleged fraudulent transfers. Plaintiffs were entitled to rely upon their counsel in making such pleading decisions.

Ultimately, discovery revealed that plaintiffs' claims against Bernardo, Rick, Clem, and Ben-Yishay should be dismissed. The alleged misconduct was committed by John alone, and the Garwood, North Brunswick, Hillsdale transactions were not fraudulent. Thus, there was no basis to hold these defendants liable. However, there was much to unravel to reach that conclusion. That summary judgment was granted to these defendants does not warrant a conclusion that the litigation against them was frivolous as defined by N.J.S.A. 2A:15-59.1 and Rule 1:4-8.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION